UNITED STATES of America, Plaintiff-Appellee,

v.

Roy W. PILLING, Jimmy Lee Penix, Alan Russell Varley, and Richard Oliver Christensen, Defendants-Appellants.

Nos. 81–1597, 81–1661, 81–1668 and 81–1687.

United States Court of Appeals, Tenth Circuit.

Oct. 4, 1983.

Teresa Black, Asst. U.S. Atty., Oklahoma City, Okl. (William S. Price, U.S. Atty., Oklahoma City, Okl., with her on brief), for plaintiff-appellee.

Jack D. McCurdy, Oklahoma City, Okl. (Garland Bloodworth, Oklahoma City, Okl., with him on brief), Bloodworth & Associates, Oklahoma City, Okl., for defendant-appellant Roy Pilling.

C. Merle Gile, Oklahoma City, Okl. (D.C. Thomas, Oklahoma City, Okl., with him on brief), for defendant-appellant Jimmy Lee Penix.

James M. Gattey, San Diego, Cal., Barry R. Davis, Oklahoma City, Okl., for defendant-appellant Richard Oliver Christensen.

Before BARRETT and SEYMOUR, Circuit Judges, and KERR, District Judge of the United States District Court for the District of Wyoming, sitting by designation.

BARRETT, Circuit Judge.

Richard Oliver Christensen (Christensen), Jimmy Lee Penix (Penix), Roy W. Pilling (Pilling) and Alan Russell Varley (Varley) each appeal verdicts of guilty following a three week jury trial to Count I of a five-count indictment. Count I charged that commencing April 1980, and continuing until about August 30, 1980, in Oklahoma City, Oklahoma, and Colorado, California, Texas, and Lima, Peru, the appellants "did combine, conspire, confederate and agree with Edward W. James, III (James), Ronald Anthony Kleist (Kleist), Barton Lane Richards (Richards), and with other persons unknown to the Grand Jury, to violate Title 21, United States Code, Section 952 in that they did conspire to import into the United States from Peru cocaine HCL, a Schedule II controlled substance." In addition: (a) Christensen and Penix were found guilty of Count IV charging that on or about August 25, 1980, at Texas and at Norman, Oklahoma, they did unlawfully travel in interstate commerce from San Antonio, Texas, to Norman, Oklahoma, in violation of 21 U.S.C. § 841(a)(1), to take possession of a shipment of nine crates containing about 8.1 kilograms of cocaine concealed in 16 one-gallon cans of Glashol and that the defendants performed or attempted to perform acts to carry out the unlawful activity, all in violation of 18 U.S.C. § 1952; (b) Penix was found guilty of Count V of the indictment charging that on or about August 30, 1980, the defendant knowingly used a telephone communication facility at Texas and Oklahoma City to discuss with James and Kleist the delivery of nine crates containing 16 one-gallon cans of Glashol in which cocaine was concealed, all in violation of 21 U.S.C. §§ 843(b) and 963; (c) Pilling was found guilty of Count II of the indictment charging that on or about August 27, 1980, in New Mexico and Oklahoma he did use a telephone communication facility in facilitating the conspiracy to import cocaine by discussion with James relative to the arrangements for delivery of nine crates containing the cocaine, all in violation of 21 U.S.C. §§ 843(b) and 963.

None of the appellants were charged with possession of cocaine or the actual distribution thereof, but the Grand Jury charged seven specific occurrences constituting the conspiracy, together with twelve specific overt acts in furtherance of the conspiracy designed to accomplish the objectives thereof.

On appeal following jury convictions, we must view the entire record "in the light most favorable to the Government in order to determine whether the evidence, both direct and circumstantial, together with all reasonable inferences to be drawn therefrom, is substantial enough to establish guilt beyond a reasonable doubt." *United States v. Petersen*, 611 F.2d 1313 (10th Cir. 1979), *cert. denied*, 447 U.S. 905, 100 S.Ct. 2986, 64 L.Ed.2d 854 (1980); *Mares v. United States*, 409 F.2d 1083 (10th Cir.1968), *cert. denied*, 394 U.S. 963, 89 S.Ct. 1314, 22 L.Ed.2d 564 (1969). "Evidence is not necessarily insufficient merely because the witness' testimony has been contradictory and the explanations therefore difficult of belief." *United States v. Jackson*, 579 F.2d 553 (10th Cir.1978) 439 U.S. 981, 99 S.Ct. 569, 58 L.Ed.2d 652 (1978), quoting from *Batsell v. United States*, 403 F.2d 395 (8th

Cir.1968), *cert. denied,* 393 U.S. 1094, 89 S.Ct. 865, 21 L.Ed.2d 785 (1969). The evaluation of the credibility of witnesses is a matter for the jury and is not a function of an appellate court. *United States v. McClain,* 501 F.2d 1006 (10th Cir.1974). The court of appeals is bound by the rule that resolution of conflicting evidence is exclusively within the discretion of the jury, as the trier of fact, and its findings must be given added weight when the opportunity to hear and observe the witnesses is considered. *United States v. Hubbard,* 603 F.2d 137 (10th Cir.1979). These rules become particularly important in cases involving detailed transactions, meetings, etc., proof of which, in an evidentiary sense, is necessary in order to establish a conspiracy; and even more so when the Government's case is primarily developed, as here, by testimony of two co-conspirators, Edward W. James, III, a/k/a "Dub" James, and Richards, who, together with Ronald Kleist, did the actual smuggling of cocaine from Peru to the United States. *See United States v. Jackson, supra.*

The above rules are important in cases such as this because, by necessity, proof of an ongoing conspiracy involving the importation of and/or distribution of a controlled substance is, in an evidentiary sense, closely akin to a jigsaw puzzle. The Government must present the evidence in such a manner that the "parts" fit together to establish the charges advanced. The evidence in this case is both direct and circumstantial. The jury found the appellants guilty, thus determining that the Government had borne the burden of proof of guilt beyond a reasonable doubt.

Some background facts, in summary fashion, are in order. The intricate scenario, as evidenced by the three-week trial record, makes it impossible to fully detail the facts reviewed. Thus, in "capsule" form we will endeavor to recite the relevant facts. The "actors" in this complicated case are all generally college educated, in their early or mid thirties, members of the high "middle class" with substantial "white collar" credentials. At the "hub" of the conspiracy were three individuals, each of whom, at the trial of this case, had been indicted and had entered guilty pleas to charges arising out of the cocaine smuggling conspiracy charged. The "ringleader" was probably James, age 36. He had obtained a Master's Degree in Education and, following some years of teaching and service as principal of an elementary school in Norman, Oklahoma, he determined to retire from education in 1977. For a short time he pursued house painting and occasional drug dealings to meet his needs. He was no stranger to the drug dealing business. James moved to Eagle, Colorado, in February, 1980 where he resided in a home owned by his brother-in-law, Ronald Kleist, and his sister, Jennie Von Kleist, a/k/a Char or Charr Kleist. James testified that he moved to Colorado in order to enter into the "cocaine smuggling business" with Ron Kleist and Richards, of Vail, Colorado. James, Kleist, Jennie and Richards had prior drug dealing experience. [R., Vol. XVIII, p. 1335]. The record evidences that James, Kleist and Richards were the "hub" of the drug-smuggling conspiracy.

At the time of trial of the case at bar, James, Kleist and Richards had been indicted and were serving sentences arising out of the drug smuggling activities involved in this case. Each had pled guilty. James had entered into a plea agreement with the Government whereby, in consideration to acceptance of his plea to two counts of a six-count indictment, he agreed to testify as a Government witness against Kleist and Richards and to otherwise cooperate with the Government in other matters involving the drug smuggling activities. James testified at trial and gave full and comprehensive testimony about the entire scheme. At the time of James' appearance as a witness herein, he was incarcerated at the Federal Prison Camp at Safford, Arizona, serving a concurrent term of three years to two counts. His testimony was most damaging to the theories and/or defenses advanced by the appellants. Kleist did not appear as a witness at this trial following his plea and incarceration.

Richards, 32 years of age at the time of this trial, was serving a five-year sentence at Lompoc Prison Camp, California, following his plea to two counts, one involving a conspiracy to import cocaine and the other, use of a telephonic device to promote the conspiracy. Richards did not appear as a witness voluntarily. He appeared under order of the court whereby he was granted immunity, except for perjured testimony. He testified reluctantly; in fact, the Government was permitted to interrogate him as a hostile witness. His testimony in large measure corroborated that of James and Jennie Von Kleist. She, age 37 at the time of this trial, was divorced from Kleist. She had not been prosecuted. She appeared under Government subpoena and the grant of immunity in connection with all charges involved in this case with the exception of perjured testimony. In sum, the testimony of James, Richards and Jennie Von Kleist, together with other Government testimony and exhibits, if believed by the jury, as it was, was quite substantial and damaging.

Kleist and Richards owned a business in Eagle, Colorado, known as Promethean Tile when James arrived on the scene from Oklahoma. The business was in bad financial straits and Kleist and Richards were in need of money for their business and personal needs. A scheme was devised between James, Kleist and Richards to import cocaine from Peru for resale and profit in the United States. Various means were employed to legitimize the first trip to Peru, basically using a honeymoon for recently married Ron and Char Kleist and the promotion of Promethean Tile in South America as "fronts". Many details were worked out in this regard in order to deceive customs officials. Jennie Von Kleist contributed about $17,000.00, which she had recently inherited, in the Promethean Tile business and the scheme. Pilling, the owner of a business known as Five Star Chemical Company (Five Star) of Oklahoma City, Oklahoma, which was also in pressing financial straits, met with James, Kleist, Richards and Char at his place of business and "invested" $10,000.00 in the initial trip

to Peru. Pilling was to double his investment from the profits.

The plans worked to perfection. About April 10, 1980, Kleist and Jennie (Char) arrived in Lima, Peru, for their honeymoon. James and Richards "fronted" the promotion of Promethean Tile sales. A kilo of cocaine was purchased in Peru, inserted in or packed in the display tiles, flown from Peru to Brazil and from there to Eagle, Colorado. The cocaine was of high quality. It was thereafter bottled in 8-ounce bottles and taken to California by James and Kleist where contacts and meetings were had with Christensen, attended by James, Kleist, Richards and Jennie. Prior to leaving California, the cocaine was sold with the exception of some five ounces which were delivered to Varley by Kleist.

The profit from the smuggling enterprise elated James, Kleist and Richards. A second trip to Peru to smuggle cocaine was quickly agreed upon by James, Kleist and Richards. They were in need of "investors" with substantial cash and additional or new fronting to attempt to legitimize the trip and to avoid detection. A complicated series of trips and meetings between James, Kleist, Richards and Jennie on the one hand and the appellants on the other followed. The "cover" for the second trip was initially to involve both Promethean Tile Company and Five Star. It was ultimately determined, following discussions between James, Kleist and Richards, as "hub" conspirators, and the appellants, as "investors" or "spoke" conspirators, that the second trip to Peru should involve the promotion of Five Star chemicals and equipment with business interests in Peru and South America.

The use of a chemical solution whereby the cocaine would be dissolved and, following entry into the United States, reconstituted was discarded in favor of a plan to bring the cocaine out of Peru in "flake" form in crates of Five Star. Pilling set up a variety of business identifications and lists of chemical products and machines to legitimize the venture. James and Kleist were adequately identified as representa-

tives of Five Star prior to the trip. Prior to their departure for Peru, James and Kleist met in San Antonio, Texas, with Penix and Christensen, who "invested" $15,000.00 in the smuggling plan. James and Kleist arrived in Peru about June 20, 1980. The cocaine, placed in some nine crates of Glashol designed for shipment to James at Five Star, was detected in Peru prior to shipment. The United States Drug Enforcement Administration (DEA) was contacted. The shipment was then made under surveillance and when claimed in Oklahoma City, arrests of James, Kleist and Richards soon followed. The cocaine concealed in the crates, consisting of about 18 pounds, was purchased for about $140,000.00. Melvin B. Ashton, Agent in Charge, Oklahoma City Resident Office, DEA, Department of Justice, testified that he interviewed James on October 29, 1980 (James was available to be called as a witness at trial) and James related meetings, trips, investments and transactions involving the cocaine smuggling scheme and the roles played by the appellants which closely parallel James' trial testimony, substantially corroborated by Richards and Jennie Von Kleist. The appellants, as the "investors" in the cocaine smuggling scheme became the "spokes" of the conspiratorial wheel.

Kleist and Richards borrowed $8,500.00 from Varley and he was partially repaid in cocaine.

Christensen and Penix owned a business in San Antonio, Texas, known as Mineral Hunters, Inc., which dealt in the sale of decorative rocks and fossils. They had sold cocaine for Kleist in the past. In March 1980, Christensen and Penix visited in Colorado with Kleist and Richards, ostensibly out of interest in the tile business. They loaned Kleist and Richards $10,000.00 with the understanding that Christensen and Penix would purchase some of the cocaine at a profit if the initial smuggling trip proved successful.

James contacted Pilling at Five Star Chemical Company in Oklahoma City and solicited his investment in the scheme.

Each of the appellants testified in his own behalf and presented other witnesses and exhibits. Without exception, each denied any knowledge of the cocaine smuggling scheme. All appellants contended, essentially, that they believed they were investing in legitimate business enterprises and that they had no knowledge of or intent to invest in a cocaine smuggling scheme. They did acknowledge acquaintanceship with one or more of the "hub" co-conspirators, James, Kleist and Richards, and also with Jennie Von Kleist. They also acknowledged that certain moneys were advanced to enhance business prospects of Five Star, Mineral Hunters, Incorporated, and Promethean Tile. For example, Pilling testified that James wanted to be factory representative of Five Star with an office in South America for exporting and importing, the latter involving Peruvian curios and rugs and other interior decorating materials. Pilling handed James cash in the amount of $10,000.00 on two occasions [R., Vol. XXI, pp. 2230, 2231, 2238]. Penix, a graduate of the University of Texas with a degree in geology, had become acquainted with Christensen. Penix organized a business known as Minerals Unlimited, located at Austin, Texas. It sold natural minerals, fossils and seashells for decorative purposes in homes and offices. Richard Christensen and his father, Oliver, invested in the business. They were interested in broadening out the business to include wall hangings of decorative rugs and tapestries and cut tile from agate to be imported from Brazil. Penix and Christensen became aware of the business known as Promethean Tile, of which Bart Richards was the "brains". Penix and Christensen met with James, Kleist and Richards in Colorado at which time some $10,000.00 was "loaned" to Kleist and Richards to help the company. James was present and inquired of Penix and Christensen about representing them in South America in buying products for importation.

Contrary to the testimony of James and Richards that he "invested" $25,000.00 in the cocaine smuggling scheme, Varley testified that he gave them $25,500.00 for pur-

chase of an extruding machine which, together with a prior loan, brought his total unpaid investment to about $30,000.00. He denied the testimony of James and Richards that the $30,000.00 "investment" was in the cocaine smuggling scheme which, if successful, would have realized a kilo of cocaine and, if cut to 10%, may have realized some $210,000.00. Varley testified that he tendered the $25,500.00 in cash and that there was no written agreement evidencing the loans. [R., Vol. XXII, pp. 2807–2811].

While there are separate or individual issues raised on appeal by one or more of the four appellants, we deem the following issues determinative of these appeals. They are whether (1) there was sufficient evidence to sustain the jury's determination of guilt as to each defendant-appellant as found; (2) the evidence established the existence of a single conspiracy as charged or multiple conspiracies; (3) the trial court erred in admitting co-conspirators' hearsay testimony; (4) the Government "connected-up" the improperly admitted hearsay testimony of co-conspirators with independent proof of the existence of the conspiracy; and (5) admitted evidence of uncharged drug transactions; i.e., prior bad acts, was prejudicial.

## I.

Appellants contend, directly or indirectly, that the Government failed to present substantial evidence in support of the jury's verdict of guilt of each defendant to those counts upon which guilt was found beyond a reasonable doubt.

■ We will not rehash the detailed evidence. Our summary review does, we believe, establish that the testimony of the "hub" co-conspirators, James and Richards, bolstered by the corroborated testimony of Jennie Von Kleist and others, when considered with the circumstantial evidence presented, clearly evidences one "scheme"; i.e., importation of cocaine from Peru to the United States for profit. The evidence is substantial that each of the appellants did "invest" in the scheme for profit with full knowledge of the cover-up plans, and the

dates of the trips. The delivery of large sums of cash to the "hub" co-conspirators, ostensibly for the purposes of loans or investments in legitimate business enterprises, was not evidenced by notes, security interests, or other written documents. These were not the practices of business entrepreneurs who are well educated and acquainted with the ways of the business world.

■ The large amounts of moneys delivered by the defendants to the "hub" co-conspirators under the circumstances of this record were not explained to the satisfaction of the jury. When the entire evidence is considered, we hold that the evidence was strong and sufficient to sustain the jury's verdicts. An unlawful agreement among conspirators is established if the jury finds, as here, that the acts, discussions, conduct and surrounding circumstances lead a reasonable mind to conclude beyond a reasonable doubt that the unlawful agreement did exist. *United States v. Jackson*, 482 F.2d 1167 (10th Cir.1973), *cert. denied*, 414 U.S. 1159, 94 S.Ct. 918, 39 L.Ed.2d 111 (1974).

## II.

Appellants contend that the evidence established the existence of multiple conspiracies rather than a single conspiracy as charged, and thus the motions for dismissal, judgment of acquittal, mistrial and instruction on multiple conspiracies was required. We disagree.

There was one conspiracy in this case— that of importing cocaine from Peru into the United States. It was born when James first arrived in Eagle, Colorado. He, Kleist and Richards, the "hub" of the conspiracy, soon agreed upon a scheme to effectuate the illicit drug transactions. There was nothing whatsoever indicating that one trip and one trip only to Peru was contemplated. The "scheme" was open-ended, designed to serve the intended purpose: that of realizing substantial sums of money from the sale of imported cocaine in the United States. The reason was simple. James, Kleist and Richards were hard pressed for

funds. Bankruptcy loomed for Kleist and Richards. Each had extensive prior experience in illicit drug transactions and all were knowledgeable with regard to the extreme profits to be realized if the illegal scheme should succeed. Further, each of the original three co-conspirators was fully aware of the risks involved in the scheme. However, they were hard pressed financially and were eager to recruit "investors" to see the scheme through.

In *United States v. Andrews,* 585 F.2d 961 (10th Cir.1978), we there observed that which we believe is applicable here in rejecting appellants' contentions that the evidence established the existence of multiple conspiracies, rather than one as charged:

The essence of the crime of conspiracy is an agreement to violate the law. *United States v. Butler,* 494 F.2d 1246 (10th Cir.1974); *Carter v. United States,* 333 F.2d 354 (10th Cir.1964). The evidence in a criminal conspiracy trial, such as the instant case, need only establish the existence of a conspiracy and that a defendant knowingly contributed his efforts in furtherance thereof. *United States v. Jackson,* 482 F.2d 1167 (10th Cir.1973), *cert. denied,* 414 U.S. 1159, 94 S.Ct. 918, 39 L.Ed.2d 111 (1974); *Collins v. United States,* 383 F.2d 296 (10th Cir.1967). The nature of the offense of conspiracy with its attendant aspects of secrecy, often requires that elements of the crime be established by circumstantial evidence. Thus, the common plan or purpose may be inferred from a combination of circumstances. *Jordan v. United States,* 370 F.2d 126 (10th Cir.1976), *cert. denied,* 386 U.S. 1033, 87 S.Ct. 1484, 18 L.Ed.2d 595 (1967); *Baker v. United States,* 329 F.2d 786 (10th Cir.1964), *cert. denied,* 379 U.S. 853, 85 S.Ct. 101, 13 L.Ed.2d 56 (1964). The Government's evidence may establish an on-going course of conduct giving rise to one continuing conspiracy, covering an extended period of time. *United States v. Bridwell,* 583 F.2d 1135 (10th Cir.1978); *United States v. Gunter,* 546 F.2d 861 (10th Cir.1976), *cert. denied,* 431 U.S. 920, 97 S.Ct. 2189, 53 L.Ed.2d 232 (1977). Accordingly, a party may join an ongoing conspiracy during its progress and become criminally liable for all acts done in furtherance of the scheme. *United States v. Gamble,* 541 F.2d 873 (10th Cir. 1976); *United States v. Thomas,* 468 F.2d 422 (10th Cir.1972), *cert. denied,* 410 U.S. 935, 93 S.Ct. 1389, 35 L.Ed.2d 599 (1973). Once a conspiracy is established, only slight evidence is required to connect a co-conspirator. *United States v. Turner,* 528 F.2d 143 (9th Cir.1975), *cert. denied,* 429 U.S. 837, 97 S.Ct. 105, 50 L.Ed.2d 103 (1976); *United States v. Rodriquez,* 498 F.2d 302 (5th Cir.1974); *United States v. Marrapese,* 486 F.2d 918 (2nd Cir.1973), *cert. denied,* 415 U.S. 994, 94 S.Ct. 1597, 39 L.Ed.2d 891 (1974).

585 F.2d at p. 964.

The evidence in this record established that there was one conspiracy, joined by various co-conspirators as the scheme progressed. The indictment charges a conspiracy to import cocaine into the United States from Peru from April 1980, until August 30, 1980. The object was and at all times remained that of importing cocaine for profit upon distribution in the United States. It matters not how many trips were involved in fulfillment of the scheme. The plan, design and purpose was constant—the realization of great profit should the scheme succeed. It makes no difference that the "actors" or participants joined the conspiratorial scheme at different times under varying circumstances. This was a single scheme, a single conspiracy at all times. The "common objective" test has been used often to connect the many facets of drug importation and distribution schemes. *United States v. Watson,* 594 F.2d 1330 (10th Cir.1979), *cert. denied,* 444 U.S. 840, 100 S.Ct. 78, 62 L.Ed.2d 51 (1979).

### III. and IV.

Appellants contend that the trial court erred in not making a determination whether there was substantial, independent evidence of the alleged conspiracy at the close of all of the evidence before permitting the jury to consider hearsay testimony of co-conspirators. Further, appellants contend

that the Government improperly "connected up" alleged improperly admitted hearsay testimony with independent proof of the existence of the conspiracy. Appellants point to the following language in *United States v. Peterson, supra,* quoting *United States v. James,* 590 F.2d 575, 582 (5th Cir.1979) (en banc), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979), and contend that the trial court *did not* make a finding that the existence of the alleged conspiracy was established by evidence independent of the hearsay testimony of co-conspirators:

> [R]egardless of whether the proof has been made in the preferred order, or the co-conspirator's statement has been admitted subject to later connection, on appropriate motion at the conclusion of all the evidence the (district) court must determine as a factual matter whether the prosecution has shown by a preponderance of the evidence independent of the statement itself (1) that a conspiracy existed (2) that the co-conspirator and the defendant against whom the co-conspirator's statement is offered were members of the conspiracy and (3) that the statement was made in the course and in the furtherance of the conspiracy.

611 F.2d at pp. 1330, 1331.

The Government responds that appellants have not specified where, in the trial transcript, the hearsay is shown or whether proper objection was lodged or whether it was plain error. Further, the Government argues that it is well settled that hearsay, in itself, is not a proper ground for reversible error, nor is it always inadmissible, citing to Rule 803, *Federal Rules of Evidence; United States v. Amon,* 669 F.2d 1351, 1358 (10th Cir.1981), *cert. denied,* —— U.S. ——, 103 S.Ct. 57, 74 L.Ed.2d 61; and *United States v. Popejoy,* 578 F.2d 1346, 1350 (10th Cir.), *cert. denied,* 439 U.S. 896, 99 S.Ct. 257, 58 L.Ed.2d 243 (1978). Our review of the record substantiates the Government's contentions. Even so, we will discuss the manner in which the trial court admitted that which the court arguably considered hearsay. In this regard, we repeat that two of the "hub" co-conspirators, James and Rich-

ards, testified as Government witnesses, as did Jennie Von Kleist. Each of the appellants, charged as co-conspirators, whom we have referred to as "spokes" of the conspiratorial wheel, voluntarily testified in their own defense. Of the charged co-conspirators, only Ronald Kleist did not testify at trial.

■ The record reflects that, contrary to appellants' contention, the trial court did, at the close of the Government's case, find that the Government had established, by a preponderance of the evidence, that a conspiracy existed, the defendants were members of the conspiracy and that the hearsay statements of the co-conspirators were made in the course of and in furtherance of the conspiracy. After the Government rested, and out of the presence of the jury, the trial court stated:

> THE COURT: I think it comes now for the Court to complete the record with reference to what the Court said at the beginning of the trial of this case.

> The Court's finding at the close of the Government's evidence, co-conspirators hearsay statements: Pursuant to the 10th Circuit Court's holding in the case of the *United States v. Petersen,* 611 F.2d 1313, (10th Cir.1979), the Court now makes the following finding:

> One, the Court reaffirms its finding that in this case it was not reasonably practical to require the following showings be made before admitting hearsay statements of co-conspirators, or statements of co-conspirators.

> Two, regarding those co-conspirators' hearsay statements conditionally admitted by the Court subject to linking up or tying in, the Court finds these statements were properly admitted against other members of the conspiracy because the prosecution has shown by a preponderance of the evidence, independent of each statement itself that (a) a conspiracy existed, and (b) the conspiracy and the defendants against whom the co-conspirators' statements were offered, were members of the conspiracy and (c) that the

statement was made during the course and in furtherance of the conspiracy. [R., Vol. XX, pp. 1950, 1951].

We observe that there was an abundance of evidence independent of the testimony of James, Richards and Jennie Von Kleist relative to their *direct observations, contacts and conversations* with the appellants (which was not hearsay) relative to the smuggling scheme, the investment and/or reinvestment of money in the scheme, letters, travel vouchers and other indicia of the existence of the conspiratorial scheme.

Furthermore, this Court, in *United States v. Petersen, supra,* after reviewing our holding in *United States v. Andrews, supra,* pertinently observed:

We have carefully reviewed the evidence as to each complaining appellant in regard to this issue. We observe that in the instant case the District Court employed the test previously adhered to in this Circuit.

Following the presentation of the Government's case in chief, the trial judge ruled that the Government had presented sufficient evidence, independent of the hearsay statements, to support a finding by the Jury as to each Defendant concerning the existence of the requisite elements.

611 F.2d at p. 1329

In this case, the trial court made a preliminary finding *in camera* that the "preferred order of proof" which this court addressed in *Andrews, supra,* and *Petersen, supra,* was not reasonably practical. Thus, any hearsay statements of co-conspirators were conditionally admitted subject to linking up or tying up. In *United States v. DuFriend,* 691 F.2d 948 (10th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 820, 74 L.Ed.2d 1017, we observed, *inter-alia.*

In *Petersen,* we stated that the trial court's determination regarding the admissibility of hearsay co-conspirators' statements should normally be made during the government's case in chief, and that a substantial independent evidence rule must be applied. *We also recommend that, whenever possible, the prose-cution first introduce its independent proof of the conspiracy and the defendants' connection thereto before admitting hearsay declarations of co-conspirators.* Id. at 1330. [Underlining supplied].

691 F.2d at p. 951

In *United States v. Stipe,* 653 F.2d 446 (10th Cir.1981), we sustained a trial court's refusal to grant the Government's pre-trial motion that it be permitted to introduce hearsay testimony of a co-conspirator prior to independent evidence of the existence of the conspiracy, subject to tying up. We there again reviewed *Andrews* and *Petersen.* Unlike the case at bar, the trial judge in *Stipe* did not make a preliminary determination that the preferred order of proof should be complied with. To the contrary, in the case at bar the trial court determined preliminarily that it was not practical to require the Government to first introduce independent proof of the conspiracy and, subsequent thereto, to establish the connection of the defendants with the conspiracy before admitting hearsay declarations of co-conspirators. We have not established a *per se* rule in this regard. In each case, the court of appeals should carefully review the record in order to ascertain whether the trial court was justified in admitting the hearsay on the conditional basis; i.e., subject to "connecting it up" with independent evidence of the existence of the conspiracy. In the case at bar, the intricate, interwoven web of contacts, meetings, disguises and unusual "business" dealings and practices justified the action of the trial court.

■ The defendants did not directly or specifically challenge the trial court's admission of the hearsay testimony at the close of all of the evidence. Thus, it is questionable that the challenge posed here was properly preserved for review. If a party fails to object to the admission of evidence, we will not reverse unless plain error was committed. *United States v. Amon, supra.* Where objections are not clearly posited, we must look to the entire record to determine whether the defendants suffered prejudice sufficient to justify reversal. Thus, in *United States v. Monaco,*

700 F.2d 577 (10th Cir.1983), where no timely objections were lodged to the admission of a co-conspirators' hearsay testimony, we observed, *inter-alia:*

> Nor does the admission of the testimony appear to have compromised the defendants' ability to receive a fair trial in any way. *See United States v. Chaney,* 662 F.2d 1148, 1153–54 (5th Cir.1981). Other evidence in the case overwhelmingly supported the conspiracy convictions.

700 F.2d at p. 582.

We hold that the trial court did not err in the conditional admission of co-conspirators' hearsay testimony. We further hold that the record contains substantial independent proof of the existence of the conspiracy.

### V.

■ Appellants object that error occurred when the trial court admitted evidence of uncharged drug transactions; i.e., prior bad acts. Appellant Pilling particularly complains of cross-examination conducted by the Government when he was asked whether he had smoked marijuana and whether he had "sniffed" cocaine, both of which he denied. No error occurred. Pilling testified that his sole interest was that of investing in the purchase of curios to be obtained in South America and that James was to go to South America both to invest in interior decorating items and to investigate the market for his business. James had previously described Pilling's drug use. This Court has held that evidence of other crimes, wrongs or acts is admissible under Rule 404(b), Federal Rules of Evidence, to establish motive, opportunity, intent, knowledge, plan, or absence of mistake or accident. *United States v. Merryman,* 630 F.2d 780 (10th Cir.1980). In the instant case, the questions went to Pilling's intent and state of mind.

■ Appellants argue that there was a fatal variance between the single conspiracy charged in Count I and the proof. They argue that where, as here, a conspiracy involves several smuggling trips, each trip must be charged as a separate count.

We have heretofore held that a single conspiracy was established. No error occurred.

■ Evidence of commission of other drug related crimes was admitted. Appellants contend that this constituted prejudicial error. We hold otherwise. Each appellant testified in his own behalf and counsel for appellants vigorously cross-examined co-conspirators James and Richards. The crux of appellants' direct testimony was that they "invested" only for legitimate business purposes and had no knowledge or participation in the drug smuggling scheme for profit. Under these circumstances, Rule 404(b), *supra,* and decisions of this court, justify the admission of evidence of prior bad acts or commission of other drug related crimes.

### VI.

■ Appellant Pilling contends that a new trial is required when a transcript is not complete. In this case, the court reporter became ill and subsequently died. Another court reporter was unable to interpret a portion of the trial record for transcription purposes. Pilling asks that the case be remanded for new trial. The "missing" portion involved the testimony of one Warren James Woodford, a chemistry professor at Emory University. He testified that he had seen Five Star Chemical laboratory and that it was an unsophisticated operation. The witness, it is urged, would have cast doubt on the testimony of a Government witness that one of the smuggling suggestions was that of dissolving cocaine in chemical fluid and reconstituting it when it arrived in the United States. The expert witness would have testified that such could likely not be done. We hold that none of this testimony was such as to require reversal and new trial because it has not been demonstrated to have been significant in light of the entire record, nor does it constitute a substantial and significant portion of the record. A showing that the missing portion of the record is "substantial and crucial" was required in *United States v. Selva,* 559 F.2d 1303 (5th Cir.1977). No such showing has been made here.

No challenge to the instructions is made. The court, we observe, was meticulous in submitting the proper jury instructions, including a cautionary instruction that the testimony of an accomplice or co-conspirator was to be received with great caution. Further, the trial court adequately instructed on the presumption of innocence, the burden of proof (placed squarely on the Government) and that no guilty verdict could be rendered unless the guilt of a defendant was established beyond a reasonable doubt.

## VII.

Appellants urge reversal on the ground that the district court failed to grant their motions for severance. We disagree. Rule 8(b), Fed.Rules Crim.Proc., 18 U.S.C.A. authorizes that defendants may be charged jointly in the same indictment where it is alleged that they participated in the same act or series of transactions. The trial court may, pursuant to Rule 14, Fed. Rules of Crim.Proc., 18 U.S.C.A. grant a severance of defendants, in its discretion, or provide whatever other relief justice requires. The trial court must weigh the prejudice to a particular defendant caused by joinder against the obvious important considerations of judicial economy and the expedition of the administration of justice. *United States v. Walton,* 552 F.2d 1354 (10th Cir.1977), *cert. denied,* 431 U.S. 959, 97 S.Ct. 2685, 53 L.Ed.2d 277 (1977). Inasmuch as severance is a matter of discretion and not one of right, the defendant must bear a heavy burden of showing actual prejudice to his case. *United States v. Petersen, supra.* That burden has not been carried here. The trial court did not abuse its discretion in denying the motions for severance.

## VIII.

We have carefully reviewed the remaining allegations of error. We hold that they are without merit.

WE AFFIRM.