UNITED STATES of America, Plaintiff/Appellant/Cross-Appellee,

v.

Robert NALL, Defendant/Appellee/ Cross-Appellant,

and

Robert McIntosh, Defendant/Appellee.

Nos. 90–2220, 90–2221 and 90–2271.

United States Court of Appeals, Tenth Circuit.

Nov. 12, 1991.

302

Paula G. Burnett, Asst. U.S. Atty., Albuquerque, N.M. (William L. Lutz, U.S. Atty., with her on the brief), for plaintiff/appellant/cross-appellee.

James B. Foy, Silver City, N.M., for defendant/appellee/cross-appellant Nall.

Joseph A. Calamia, El Paso, Tex. (Joseph 'Sib' Abraham, Jr., with him on the brief), for defendant/appellee McIntosh.

Before HOLLOWAY, LOGAN and BALDOCK, Circuit Judges.

HOLLOWAY, Circuit Judge.

I

On March 14, 1990, a five count indictment was returned by a New Mexico federal grand jury, with Count I charging Robert H. Nall, Jr. and Robert L. McIntosh with conspiracy to evade the reporting requirements of 31 U.S.C. § 5324(3) by avoiding a bank's filing of a Currency Transaction Report (CTR) as required by 31 U.S.C. § 5313(a), in violation of 18 U.S.C. § 371. Counts II through V were substantive counts charging only Nall and they were based on specific transactions, each of which was charged as a structuring of a transaction to evade the reporting requirements, 31 U.S.C. § 5324(3).[1]

At jury trial, counsel for both Nall and McIntosh made oral motions for judgment of acquittal, under Fed.R.Crim.P. 29(a), following the government's completion of its case in chief. I R. 190–94. Both motions were denied. After all the evidence was presented, both defendants again made oral motions for judgment of acquittal under Fed.R.Crim.P. 29(a), which were denied by the court. *Id.* at 243–44. On August 29, 1990, the jury returned a verdict of guilty against both defendants.

Defendant McIntosh filed a motion for judgment of acquittal pursuant to Fed. R.Crim.P. 29(c) as to Count I, the only count on which he had been indicted and convicted. Nall filed a similar motion regarding all five counts. On September 11, 1990, the trial judge issued a Memorandum Opinion and Order dismissing Count I, charging conspiracy, as to both Nall and McIntosh, but denying Nall's motion for acquittal as to Counts II through V. I Pl.R.Doc. 37. The dismissal of Count I was due to the fact that "the Government's proof did not establish a conspiracy beyond reasonable doubt." *Id.* at 5. Since McIntosh was only charged with and convicted on Count I, the dismissal of this count released him from any conviction.

The government filed a notice of appeal of the dismissal of Count I as to both Nall and McIntosh on October 9, 1990, pursuant to 18 U.S.C. § 3731. I Pl.R.Doc. 38. Judgment and sentence for Counts II through V was entered against Nall on November 21, 1990, and he was sentenced to five months on each count, all to be served concurrently with an additional two years of supervised release, provided that five months of the release was to be spent as a resident at the Alternative House of El Paso, Texas.[2] This sentence was the result of the trial court's departure downward one offense level, pursuant to § 5K2.0 of the Sentencing Guidelines.[3] Nall filed a notice of ap-

---

**1.** The indictment reads in part:

COUNT II

On or about the 9th day of June, 1989, at Las Cruces, in the State and District of New Mexico, the Defendant, ROBERT H. NALL, JR., did knowingly and willfully, and for the purpose of evading the reporting requirements of Title 31, United States Code, Section 5313(A), and the regulations promulgated thereunder, structured or attempted to structure a transaction with the Sunwest Bank of Las Cruces, New Mexico.

In violation of 31 U.S.C. 5324(3).

I Pl.R.Doc. 1 at 3. Counts III, IV and V were similar except for the date of the alleged acts which were respectively listed as the 12th, the 15th, and the 28th day of June 1989. *Id.* at 3–4.

**2.** Additionally, Nall was fined $3,000 on Count II, payable in installments of $125 per month

during the two years of supervised release. Nall was also directed to immediately pay the special assessment of $50 for each count on which he was convicted, for a total of $200.

**3.** The offense level of thirteen was reduced by the trial judge to twelve, pursuant to § 5K2.0 of the Sentencing Guidelines. *See* United States Sentencing Commission, *Guidelines Manual*, § 5K2.0 (Nov. 1990) [hereinafter U.S.S.G.]. Offense level twelve combines with a criminal history category of I to produce a sentencing range of ten to sixteen months. U.S.S.G. ch. 5, Pt. A. Under U.S.S.G. § 5C1.1(d)(2) such a sentence can be satisfied by a sentence of imprisonment for at least half of the minimum term in the guideline range in combination with the remainder of the sentence being met by a substitute punishment, such as home detention, as mandated by U.S.S.G. § 5C1.1(e).

peal regarding Counts II through V on December 3, 1990. The appeal of the United States as to Count I of the indictment and the appeal of Nall as to Counts II through V have been consolidated and will be considered by this opinion.

## II

There was evidence at trial tending to show the following:

In April 1989, Robert McIntosh, identifying himself as Tony DeSantio,[4] agreed to purchase Nall's business in Las Cruces, New Mexico, The Hitching Post, along with a residence on the same property for $185,-000. An earnest money payment of $9,000 was to be made and followed up by several installment payments for a total down payment of $85,000. Gregg Floyd (Floyd), vice-president of Las Cruces Abstract and Title, handled the paperwork on the sale for Nall.

Floyd, a government witness, testified that on April 3, 1989, McIntosh and Nall met with Floyd at his office to begin the purchasing process. I R. 66. At this meeting, $9,000 was deposited with Las Cruces Abstract and Title Company as earnest money. Floyd said that in the future he would prefer a cashier's check. Floyd also told Nall and McIntosh at that April 3 meeting that if currency were brought in, there would have to be an IRS reporting form filled out by the title company for the currency reporting. I R. 63, 67. A receipt was made out showing that the title company had received $9,000 in earnest money. I R. 69.

After this first payment was made, Nall asked McIntosh for additional money on the down payment and McIntosh paid Nall $26,000 in one lump sum. I R. 53–54.[5] Floyd testified that on June 28 in a meeting with Nall and McIntosh, Floyd was told that $26,000 had already been paid by McIntosh to Nall before the closing. I R. 74. Executive vice-president Morrow of

Sunwest Bank testified for the government that cash-in tickets indicated that three cash payments totaling $24,000 were made by the customer on Nall's note: one on June 9, 1989 of $9,000; a second on June 12, 1989 of $9,000; and a third payment on June 15, 1989 of $6,000. I R. 163–65.

Floyd testified further that on June 28, 1989, Nall, McIntosh and Floyd met to close the sale. McIntosh brought $50,000 in currency. A receipt was prepared by Floyd showing $50,000 had been paid by McIntosh to Nall. I R. 73–74. Floyd said that the preparation of the paperwork would take several hours. McIntosh asked Floyd if he could leave the money with him and Floyd said that if the money were left with him he would have the IRS forms filled out. I R. 70. McIntosh did not want any forms filled out. I R. 71. Nall said he would pay the mortgage off; he would go directly down and take care of that. I R. 72. Floyd testified: "What I recall is [McIntosh] did not want Mr. Nall to put all the money directly down, to put it in amounts less than ten thousand at a time to pay on the mortgage." I R. 72. McIntosh said the reason for this was so there would be no report made for any transaction of ten thousand. I R. 72. Nall said he thought there would be no problem with putting it in amounts less than $10,000 at a time. I R. 73. After the $50,000 was turned over to Nall, McIntosh and Nall left the Las Cruces Abstract and Title Company office together. I R. 74.

On cross-examination, government witness Floyd said that when McIntosh and Nall left the title company office, it was Floyd's firm understanding that the money was going to the Sunwest Bank to pay off the note, which was in excess of $50,000 pertaining to the property. I R. 96–97. On redirect examination, Floyd was asked to reconcile his statements about what was to happen to the $50,000 and Floyd said that his "best recollection I have at that time

---

4. Counsel for McIntosh acknowledged that McIntosh used this pseudonym throughout the transactions involved in this case.

5. Although no evidence was presented which indicates the number or form of payments which made up this $26,000, counsel for Nall and for McIntosh both state that the payment was made in one lump sum. I R. 49–50, 53–54.

there wasn't a definite agreement to pay the money in one lump sum." I R. 100.

On Government Exhibit 7, there was a credit of $8,000 shown to Nall's account on June 28. I R. 167.

Morrow testified further that on June 28 he and Anderson, another bank officer, told Nall's wife Kathy that they would not accept any more cash payments unless all the balance of the cash was applied to the note and a currency transaction report was filled out. I R. 168. The next morning Kathy brought the $42,000 in and the bank applied it to the note on June 29, 1989, and "we filled out the proper paperwork." I R. 169. Government Exhibit 9 was identified by Morrow as the currency transaction report, filled out on June 29, that the $42,000 in cash had been received. I R. 170.

Defendant Nall presented testimony by several witnesses explaining why his payments to the bank were made in the amounts he paid and why other funds were retained by him. He had an antique car business and the witnesses' testimony was introduced to show that he withheld funds to make favorable purchases of cars for his antique car inventory.

As noted, the trial judge granted the defendants' motions for judgments of acquittal as to Count I on the conspiracy charge, but entered judgments of convictions and sentences as to Nall on Counts II, III, IV and V. We turn to the arguments pressed on appeal.

### III

### Count I—Conspiracy

The district court dismissed the Count I charge against McIntosh and Nall after the jury returned a verdict of guilty as to both defendants. The court found there to be insufficient evidence as a matter of law for the jury to make its finding of guilt. The government argues that the district court erred in its dismissal of Count I because there was sufficient evidence to prove the existence of a conspiracy between Nall and McIntosh to evade the CTR requirements.[6]

█ We review the district court's determination *de novo*. A conviction by jury verdict is to be reviewed with the evidence, both direct and circumstantial, along with the reasonable inferences to be drawn therefrom, taken in the light most favorable to the verdict. *United States v. Hooks*, 780 F.2d 1526, 1531 (10th Cir.), *cert. denied*, 475 U.S. 1128, 106 S.Ct. 1657, 90 L.Ed.2d 199 (1986). In this light, the court determines whether a reasonable jury could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Bowie*, 892 F.2d 1494, 1497 (10th Cir.1990); *Hooks*, 780 F.2d at 1531.

█ There are five elements which must be present to establish a conspiracy under 18 U.S.C. § 371: there must be an agreement; the purpose of that agreement must be to break the law; there must be an overt act; the purpose of the act must be to further the conspiracy; and the defendant on trial must have entered the conspiracy willfully. *United States v. Daily*, 921 F.2d 994, 999 (10th Cir.1991). The nature of a conspiracy, with its attendant aspects of secrecy, often requires that elements of the crime be established by circumstantial evidence. *United States v. Pilling*, 721 F.2d 286, 293 (10th Cir.1983). Nevertheless, the "evidence of conspiracy—even if circumstantial—must be such as to establish beyond reasonable doubt defendant's agreement to or participation in a plan to violate the law." *United States v. Webb*, 359 F.2d 558, 562 (6th Cir.1966).

█ In this case in addition to the circumstantial evidence, such as the acts performed by the defendants, there is some direct evidence pertaining to the existence or nonexistence of the alleged conspiracy.

**6.** This issue is the only issue raised by the government in its brief as appellant. The remaining issues are all raised by Nall in his "Cross-Appellant's Brief in Chief and Appellee Nall's Reply Brief". Defendant McIntosh's Brief of Appellee in No. 90–2221 addresses only McIntosh's argument that the trial court's ruling in granting the judgment of acquittal was correct because there was no proof of a conspiratorial agreement to evade the reporting requirement.

Floyd was present at the June 28 meeting between Nall and McIntosh prior to Nall's depositing of $8,000 of the $50,000 cash at Sunwest. We note that Floyd, a government witness, testified that at the conclusion of the meeting it was his "firm understanding" that Nall and McIntosh had agreed to take the money to the bank and deposit the entire amount with Sunwest, filling out the necessary currency reporting form. I R. 96–97. Despite his redirect testimony that there wasn't a definite agreement to pay the money in one lump sum, the government's proof failed to establish a conspiratorial agreement, as the trial judge held.

"[M]ere knowledge or approval of or acquiescence in the object and purpose of a conspiracy without an agreement to cooperate in achieving such object or purpose does not make one a party to a conspiracy ...", *United States v. Butler*, 494 F.2d 1246, 1249 (10th Cir.1974); *Jones v. United States*, 365 F.2d 87, 89 (10th Cir.1966), nor establish the existence of a conspiracy. A conspiracy cannot be thrust upon a member, but instead must be purposely and voluntarily joined; there "must at some point be a meeting of the minds in the common design, purpose, or objects of the conspiracy." *Butler*, 494 F.2d at 1249. We agree with the district court that

> There is absolutely no evidence to support [a finding] that there was an agreement between Defendants to make deposits at Sunwest Bank to avoid IRS reporting requirements. At best, the evidence shows that Defendant McIntosh delivered the $50,000 to Defendant Nall pursuant to the purchase agreement. While Defendant McIntosh may have stated a preference in the manner in which the payment of the Sunwest loan was to have been accomplished, there is no evidence that he participated in or directed the manner in which Defendant Nall ultimately deposited the $50,000. There is absolutely no evidence of any agreement as to how the deposit was to be made.

I Pl.R.Doc. 37 at 4. Since no agreement was shown to have existed, we affirm the district court's dismissal of Count I for conspiracy as to both Nall and McIntosh.

## IV

■ Nall's first argument on his appeal is that there was insufficient evidence to enable the jury to find him guilty on Counts II, III, IV and V. In reviewing such a ruling, the evidence is deemed sufficient if it is such that when considered in the light most favorable to the verdict, *"any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789 (1979) (emphasis in original); *United States v. Sanders*, 929 F.2d 1466, 1470 (10th Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 143, 116 L.Ed.2d 109, 60 U.S.L.W. 3260 (U.S.1991); *see United States v. Jenkins*, 904 F.2d 549, 553 (10th Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 395, 112 L.Ed.2d 404 (1990). The evidence supporting a conviction must be substantial; that is, it must do more than raise a mere suspicion of guilt, *Sanders*, at 1470.

### A. Counts II, III and IV

Nall challenges the sufficiency of the evidence to support his convictions on Counts II, III and IV. These substantive counts charge Nall with violating the prohibition against structuring transactions to avoid reporting by financial institutions, *inter alia*, required by 31 U.S.C. § 5313(a). Title 31 U.S.C. § 5324 provides that "[n]o person shall for the purpose of evading the reporting requirements of section 5313(a) with respect to such transaction—.... (3) structure or assist in structuring, or attempt to structure or assist in structuring, any transaction with one or more domestic financial institutions."

The reporting requirement of § 5313(a) essentially is that when a domestic financial institution is involved in a transaction for payment, receipt or transfer of United States coins or currency in an amount, denomination or amount and denomination, or under circumstances which the Secretary prescribes by regulation, the institution or any other participant in the transaction

shall file a report as the Secretary prescribes. At the times involved here, such currency transaction reports were required of financial institutions by regulation for currency transactions involving more than $10,000. 31 CFR § 103.22(a)(1) (1989). The regulations parallel the provisions of 31 U.S.C. § 5324 in prohibiting structuring to evade the reporting requirements, 31 CFR § 103.53(c), and the regulations also give a regulatory definition of structuring.[7]

We have noted earlier, *see* note 5, *supra,* that counsel for Nall and for McIntosh stated that McIntosh made one lump sum payment of $26,000 to Nall. This followed McIntosh's first $9,000 payment to Nall of earnest money on April 3, 1989, when the Hitching Post transaction was being set up with Floyd at the Las Cruces Abstract and Title Company. This $26,000 payment of course preceded the June 28, 1989, meeting to close the sale. During this period, from April 3 to June 28, as also detailed earlier, the government's evidence showed three cash payments were made by the customer on Nall's note: $9,000 on June 9; $9,000 on June 12; and $6,000 on June 15, all in June 1989. The record is not clear as to the discrepancy of $2,000 between these payments totaling $24,000 and the $26,000 lump sum payment by McIntosh to Nall.

Nevertheless, the three payments to the bank by Nall within that period of June 9 to June 15, all in amounts below the $10,000 level that would have triggered the reporting requirement for CTRs, is undisputed. We feel also that the evidence is substantial which supports the inference that Nall was aware of the existence of the CTR requirements. There was evidence that Floyd had told Nall and McIntosh at the April 3 meeting that if they brought in more currency there would have to be an IRS reporting form filled out for the currency reports, which the title company would fill out. I R. 67, 101.

We held in *United States v. Dashney,* 937 F.2d 532 (10th Cir.1991), *petition for cert. by defendant pending,* —— U.S. ——, 112 S.Ct. 402, 116 L.Ed.2d 351 that for conviction under 31 U.S.C. §§ 5322(a) and 5324(3), the government is not required to establish that the defendant had knowledge of the prohibition against structuring transactions. 937 F.2d at 537–38. From the legislative history, we concluded that "the intent required is merely to avoid the currency transaction reporting requirements, and not specific knowledge of the antistructuring law itself." Of course, a very critical element is the stipulation in the regulations that currency transactions "of more than $10,000" trigger the reporting requirement. Here, as to knowledge of that part of the regulatory scheme, the government's case on Counts II, III and IV is not strong. Nevertheless, there was evidence that as of April 3, 1989, Nall had notice of a requirement of an IRS reporting form being required if Nall and McIntosh brought in currency after the $9,000 earnest money payment made that day. I R. 67. Then there is the evidence that a lump sum amount of $26,000 was thereafter paid by McIntosh to Nall. Although this amount was available, Nall made the payments in three amounts under the $10,000 critical level, and in a fairly close time frame ($9,000 on June 9; $9,000 on June 12; and $6,000 on June 15). The jury apparently rejected the defense testimony on the theory that Nall held funds back to make antique car purchases.

Considering the evidence on Counts II, III and IV in the light most favorable to the guilty verdict, while not strong we hold the evidence sufficient to sustain the findings of guilt on those offenses under the test of *Dashney.* Upholding the sufficien-

---

7. 31 CFR § 103.11(n) provides in pertinent part:
   For purposes of section 103.53, a person structures a transaction if that person, acting alone, or in conjunction with, or on behalf of, other persons, conducts or attempts to conduct one or more transactions in currency, in any amount, at one or more financial institutions, on one or more days, in any manner, for the purpose of evading the reporting requirements under section 103.22 of this Part. 'In any manner' includes, but is not limited to, the breaking down of a single sum of currency exceeding $10,000 into smaller sums, including sums at or below $10,000, or the conduct of a transaction, or series of currency transactions, including transactions at or below $10,000.

cy of the proof on those offenses will, however, support only one conviction for structuring, as we now explain.

▉▉ We requested the parties to address a further question concerning Counts II, III and IV, first decided in *United States v. Davenport,* 929 F.2d 1169 (7th Cir.1991), and later treated in our recent opinion in *Dashney,* 937 F.2d 532. We noticed the issue, *sua sponte,* because it goes directly to the validity of Nall's multiple criminal convictions. *See Menna v. New York,* 423 U.S. 61, 96 S.Ct. 241, 46 L.Ed.2d 195 (1975) (per curiam).

In *Davenport,* the defendants were charged with twelve counts related to the structuring of an $81,500 transaction. One count was for conspiracy to violate § 5324(3). Another count charged the entire $81,500 transaction as a "structuring", while each of ten other counts charged unlawful structuring through individual deposits which had been made from the $81,-500. The Seventh Circuit held that the statute "does not forbid the making of deposits. It forbids the structuring of a transaction.... There was one structuring, one violation." *Davenport,* 929 F.2d at 1171. The court pointed out that "the structuring itself, and not the individual deposit, is the unit of crime." *Id.* at 1172. As a result, the additional ten individual structuring convictions related to the individual deposits were vacated, and only the conspiracy conviction and the one substantive structuring conviction were upheld.

In *Dashney,* we agreed with the rationale of *Davenport.* Count 1 in *Dashney* charged that the defendant structured or attempted to structure a transaction with the purchase on the same day of $99,999.93 in cashier's checks at ten banks. The purchases were accomplished at those ten banks. Count 2 alleged that Dashney attempted to structure a transaction or transactions with the purchase of cashier's checks totaling approximately $100,000, alleging transactions at two banks. These efforts alleged in Count 2 to purchase the checks, made with the same funds amounting to approximately $100,000 were unsuccessful, the government here arguing an attempt theory. It was clear from the record that the same $100,000 fund was involved in the conduct alleged in both counts. 937 F.2d at 541. We were persuaded by *Davenport* that there was a multiplicity of structuring charges, splitting up one unit of prosecution contemplated by the statute, into two substantive counts and we reversed one conviction.

In the instant case, Nall made three deposits at the same bank, Sunwest, over the course of nine days. The source of each deposit was the same lump sum of some $24,000 (or $26,000) which McIntosh had paid to Nall. Each of these three deposits was charged in a separate count, identical except for the date of the deposit. We are convinced that the government has improperly charged one structuring violation of 31 U.S.C. § 5324(3) by multiplicitous counts. As in *Dashney* and *Davenport,* Nall committed one structuring violation respecting the $26,000 lump sum payment, comprised of these three individual deposits, and there should have been only one structuring count addressing the 1989 cash deposits made on June 9, June 12, and June 15, 1989 for, respectively, $9,000, $9,000, and $6,000. Therefore, we uphold the conviction on Count II but vacate the convictions on Counts III and IV. *See Dashney,* 937 F.2d at 542.

### B. Count V

Nall argues again that there was insufficient evidence to sustain his structuring conviction on Count V. This count concerned the transactions at the time of the closing on June 28 and 29, 1989, when some $50,000 was brought by McIntosh to the closing for Nall.

We are not persuaded by Nall's contentions. The critical government testimony came first from Floyd, the vice-president of the title company. He said that on June 28, Nall and McIntosh met with him for the closing. Floyd prepared a receipt showing $50,000 had been paid by McIntosh to Nall. I R. 73–74. Floyd told them the paperwork would take several hours. McIntosh asked if he could leave the money with Floyd, who said if the money was left with him he

would have the IRS forms filled out. I R. 70. McIntosh did not want them filled out and he did not want Nall to put all the money directly down, but to do so in amounts less than $10,000; that the reason was so that there would be no report for any transaction of $10,000. I R. 72. Nall said he thought there would be no problem with this. I R. 73.[8]

We are persuaded that the evidence is sufficient to sustain the Count V structuring conviction. The jury could reasonably infer that Nall made the $8,000 payment on June 28 with knowledge of the $10,000 CTR reporting requirement, and with the intent to avoid such a report. While all the remaining $42,000 was brought in the next day, this was after the bank officer's comments caused Kathy Nall to do so. The structuring attempt by Robert Nall was adequately proven to support the Count V conviction.

Nall also makes the argument that Floyd was improperly permitted to testify about a hearsay statement made by the alleged co-conspirator McIntosh, although the conspiracy theory was rejected by the trial judge as not proven. The specific statement at issue is Floyd's testimony that McIntosh told Floyd that he did not want a CTR filled out on June 28, 1989 for the $50,000.

Nall concedes that there was no objection to the introduction of this statement. When reviewing the admission of claimed hearsay evidence to which no objection was made we cannot reverse absent a finding of plain error. *United States v. Bowser*, 941 F.2d 1019, 1021 (10th Cir.1991); *see Pilling*, 721 F.2d at 295–96; Fed.R.Crim.P. 52(b). Plain errors are those which are obvious and substantial, *United States v. Granville*, 716 F.2d 819, 821 (11th Cir. 1983), and which when viewed in light of

the entire record seriously affect the fairness, integrity or public reputation of judicial proceedings. *United States v. Young*, 470 U.S. 1, 15–16, 105 S.Ct. 1038, 1046–47, 84 L.Ed.2d 1 (1984). Plain error is found "solely in those circumstances in which a miscarriage of justice would otherwise result." *United States v. Frady*, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816 (1982).

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). In arguing that admission of the statement was plain error, Nall says the statement "indicated to the jury that at the time before Mr. Nall went to the Sunwest Bank to make a deposit, he knew a [CTR] had to be filled out." Cross–Appellant's Brief in Chief at 17. We feel that as to Nall, the statement bearing on his knowledge of the reporting requirement is not hearsay. *See United States v. Lambinus*, 747 F.2d 592, 597 (10th Cir.1984), *cert. denied*, 471 U.S. 1067, 105 S.Ct. 2143, 85 L.Ed.2d 500 (1985). We find no reversible or plain error on this ground.

In sum, the dismissal of Count I as to both McIntosh and Nall is AFFIRMED. The convictions of Nall on Counts II and V are also AFFIRMED. The convictions of Nall on Counts III and IV are VACATED as multiplicitous. The case is remanded to the district court with directions to vacate the sentences of Nall and to resentence him on the remaining convictions on Counts II and V in light of this opinion.

---

**8.** We note also that there was evidence that the Sunwest Bank vice-president, Mr. Foddrill, saw Nall on June 28 in the office of Kathy Nall, who worked for the bank. Robert Nall had $50,000 which Foddrill suggested putting in a safety deposit box. I R. 140–41. The bank's executive vice-president, Mr. Morrow, testified about the bank's cash-in ticket showing $8,000 credited to Nall's account on June 28.

Two bank officers told Kathy Nall they would accept no more cash unless all the remainder was applied to the note and a CTR was filled out. I R. 168. The remaining $42,000 was brought in by Kathy Nall the next day, and this was applied to the note and the CTR was made out. I R. 168–70.