**UNITED STATES of America,
Plaintiff/Appellee,**

**v.**

**Robert E. DAVIS, Defendant/Appellant.**

**No. 91–8008.**

United States Court of Appeals,
Tenth Circuit.

May 5, 1992.

---

Charles W. Blau, (Denise Dumon, with him on the briefs), Dallas, Tex., for defendant-appellant.

Francis Leland Pico, Asst. U.S. Atty., (Richard A. Stacy, U.S. Atty. and David A. Kubichek, Asst. U.S. Atty., with him on the briefs), Cheyenne, Wyo., for plaintiff-appellee.

Before McKAY, Chief Judge, and LOGAN, Circuit Judge, and SAM, District Judge.[*]

SAM, District Judge.

## I. INTRODUCTION

Robert E. Davis (Davis) was convicted by a jury of conspiracy to use interstate commerce to facilitate the bribery of a public official in violation of 18 U.S.C. §§ 371 and 1952, and of use of interstate commerce to facilitate the bribery of a public official in violation of the Travel Act, 18 U.S.C. § 1952. The trial court sentenced Davis to 27 months imprisonment on both counts, to be served concurrently. Davis appeals his convictions.

## II. BACKGROUND

The evidence, viewed in the light most favorable to the government, may be summarized as follows:

In August of 1985, Davis began an insurance business called Lloyd's U.S. It was licensed as a "Lloyd's Plan" insurer which denotes an unincorporated association of individual underwriters who undertake to insure risk purchasing groups (RPGs) on a "surplus lines" basis.[1] Davis' business was operating out of Dallas, Texas.

In the fall of 1986, Lloyd's U.S. was experiencing serious difficulties. Between August 7, 1986 and September 23, 1986, five states determined that they would no longer allow Lloyd's U.S. to conduct business within their boundaries.[2] During the same time period, Lloyd's U.S. was under scrutiny in the state of Texas.

In August 1986, Gordon Taylor (Taylor), the Wyoming State Insurance Commissioner, contacted Davis to request that Lloyd's U.S. continue a medical malpractice policy for Casper, Wyoming's only neurosurgeon. In March of 1987, Taylor travelled with Kelly Davis, his deputy insurance commissioner, and others to Texas where he met with Davis to discuss the possibility of Davis expanding his business in Wyoming, particularly with respect to RPGs and medical malpractice risk retention groups.

In April 1987, Taylor was reappointed as insurance commissioner. Taylor's office was located in Cheyenne, which was 150 miles from his family and residence in Glenrock. Taylor lived in an apartment in Cheyenne during the week and would commute to Glenrock on the weekends. Because of the difficulty with this commute,

---

[*] Honorable David Sam, United States District Judge for the District of Utah, sitting by designation.

1. A RPG is an entity comprised of professionals or businesses that share similar risks and are unable to obtain insurance from carriers admitted to sell insurance in a given state. The businesses or individuals form an RPG to obtain insurance coverage from a carrier not admitted to sell insurance in that state. The coverage is known as a "surplus line" insurance. Federal law exempts RPGs from state regulation, except as such regulation may pertain to the RPGs' ministerial functions. 15 U.S.C. § 3903 (1982).

In order to write "surplus lines" insurance in a state in which the insurance company is not admitted, the insurance carrier must be licensed and admitted to some other state.

2. The states which had "blackballed" Lloyd's U.S. included California, Utah, Illinois, Oregon and North Carolina. Appendix to Brief for Appellant (Aplt.App.) at 384. There is some evidence that the problems Lloyd's U.S. faced in those states were related to or caused by Lloyd's of London which, by virtue of a legal settlement, was ultimately required to pay Lloyd's U.S. several million dollars.

Taylor put his Glenrock house up for sale. However, at that time the housing market in Wyoming was experiencing severe difficulties.

In April 1987, Davis, his business partner Jim Howard (Howard), and Davis' employee Michael DePaemelaere (DePaemelaere) attended the quarterly convention of the National Association of Insurance Commissioners (NAIC) held in Lexington, Kentucky. Taylor was also in attendance. One evening during the convention, Davis, Howard and DePaemelaere met with Taylor and others for dinner. In the course of their conversation, they discussed the problems Taylor was having in selling the Glenrock house. DePaemelaere suggested that U.S. Fiduciary Trust Company, a company under Davis' direction that managed the RPGs, might be able to purchase the Glenrock house.

Within just a few days, Davis contacted Taylor by telephone and indicated he was interested in purchasing Taylor's house as an "investment." Taylor had listed the house at $100,000, but told Davis his asking price was $105,000. Taylor offered to secure another appraisal, which offer was declined. Davis knew at that time that the current housing market in Glenrock was depressed.

Davis discussed the proposed purchase with Howard who advised Davis that he could not legally purchase the house because Lloyd's U.S. could not carry real estate on its financial statement. Howard testified at trial that during the course of that conversation, Davis said "he was going to purchase that home because he needed help in Wyoming." Appendix to Brief for Appellant (Aplt.App.) at 867.

Davis made arrangements with Michael Patton (Patton)—a business associate of his—to purchase the Glenrock house. He told Patton that "he wanted to do [Taylor] a favor." Aplt.App. at 757. Davis also asked Patton to buy the Glenrock house without using Davis' name. Pursuant to Davis' instructions, Patton travelled to Wyoming to consummate the purchase. Taylor received a check for more than $60,000 from the transaction, which reflected his

equity in the house. After Patton concluded the transaction he returned to Dallas where he met with Davis and told him, among other things, that he would likely lose thirty to forty thousand dollars on the Glenrock house. Patton testified to Davis' response "that he knew that he was going to lose 30 to $40,000 on the transaction." Aplt.App. at 769.

On May 5, 1987, DePaemelaere filed articles of incorporation in the state of Wyoming for United States Fiduciary Company, an entity that would manage Davis' RPGs. Beginning on May 7, 1987, Davis caused nine separate RPGs to file notices of intent to do business with the Wyoming Department of Insurance.

In mid–1987, the Wyoming Department of Insurance, under the direction of Kelly Davis, formed a committee to draft regulations implementing the Wyoming Risk Retention Act of 1987 (Wyo.Stat. § 26–36–101 et seq. (1977 & Supp.1991)). The committee consisted of Kelly Davis and two other representatives of the Wyoming Insurance Department; Manny Puebla, representing a risk retention group specializing in medical malpractice coverage; and Michael DePaemelaere, Drew Bagot (another Davis employee) and two of Davis' attorneys.

Taylor requested that Kelly Davis draft proposed legislation to permit the operation of "Lloyd's Plan" insurers in Wyoming, which legislation Taylor would sponsor during the 1988 legislative session. Before Kelly Davis attempted to draft such legislation he was contacted by appellant Bob Davis, who asked if he could have his lawyers draft the legislation. Kelly Davis responded affirmatively. Kelly Davis reviewed Bob Davis' proposed drafts of the legislation and deemed them unsatisfactory. Ultimately, Bob Davis' proposed legislation was never introduced at the legislative session.

On July 13, 1990, Davis was named in a seven count information along with Taylor and Roy E. Thigpen III and charged with conspiracy to violate the Travel Act. Following a severance, the information was dismissed and Davis was charged in a two-count indictment with conspiracy to violate

the Travel Act (Count I) and violation of the Travel Act (Count II). Following a jury trial, Davis was convicted on both counts and sentenced to 27 months imprisonment on each count, which sentences were to be served concurrently.

## III. DISCUSSION

Davis challenges his convictions on the following grounds: (1) the trial court erred in denying Davis' motion for acquittal based on misinterpretion of law and sufficiency of the evidence; (2) the trial court improperly allowed irrelevant and/or highly prejudicial evidence despite Federal Rules of Evidence 402, 403, and 404(b) objections; (3) the trial court improperly allowed the government to build its case on a theory not alleged in the indictment; (4) the instructions to the jury improperly framed the issues and misled the jury; and (5) sentencing on Count I under the United States sentencing guidelines was improper.

### 1. Denial of Motion for Acquittal

■■■ Davis challenges the court's denial of the motion for acquittal on both legal and factual bases. We review the legal challenges under a de novo standard. *United States v. Backas*, 901 F.2d 1528, 1530 (10th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 190, 112 L.Ed.2d 152 (1990). However, the Court's review of the sufficiency of the evidence to uphold the conviction is conducted in the light most favorable to the government. *United States v. Peveto*, 881 F.2d 844, 860 (10th Cir.), *cert. denied*, 493 U.S. 943, 110 S.Ct. 348, 107 L.Ed.2d 336 (1989). If the jury's verdict of guilty is supported by substantial evidence, then the denial of a motion for acquittal will not be disturbed. *Id.*

#### a. *Legal Challenges*

Davis was convicted under Count I for conspiracy to violate the Travel Act, 18 U.S.C. § 371, and under Count II for actual violation of the Travel Act, 18 U.S.C. § 1952. The Travel Act proscribes the use of interstate facilities in furtherance of illegal activity. The elements necessary for a successful prosecution under the Travel Act are: (1) travel or use of facilities in interstate commerce; (2) with intent to promote manage, establish, carry on or facilitate the promotion, management, establishment, or carrying on of a prohibited activity—e.g., bribery; and (3) subsequent attempt to commit or actual commission of the proscribed activity. 18 U.S.C. § 1952 (1982).

Davis complains that the government was required to prove that he had committed the complete act of bribery before it could obtain a conviction on Count II, and that the government's failure to prove the existence of an agreement was grounds for acquittal.[3] According to Davis, Wyoming's law against bribery and, therefore, the Travel Act requires proof of the existence of an agreement between the briber and the alleged bribee.

■■■ Davis' argument is unpersuasive. Davis was convicted on Count II for violating the Travel Act, which prohibits persons from using an interstate facility to "facilitate the promotion, management, establishment, or carrying on, of any unlawful activity." 18 U.S.C. § 1952 (1982). The Travel Act, by its express language, does not require the actual commission of the underlying state offense for conviction, but rather the use of interstate facilities in furtherance of the commission of the underlying state offense. *United States v. Hines*, 696 F.2d 722, 725 (10th Cir.1982).

■■■ In *Hines*, we examined the Travel Act and concluded that a violation of state law is not an element of the Travel Act, but rather "'serves a definitional purpose in characterizing the proscribed conduct.'"

---

3. Davis' legal challenges are directed at the district court's alleged misapprehension of the elements necessary to prove a Travel Act violation. Specifically, Davis challenges the failure to require proof of an agreement under Wyoming law. This challenge is directly relevant to Count II, which charged Davis with violating the Travel Act by facilitating the bribery of a public servant. Davis does not direct his challenge on this point to the conspiracy charge contained in Count I. Therefore, this portion of the Court's decision will focus on the elements necessary to prove a Travel Act violation and an interpretation of the Wyoming bribery statute.

*Id.* at 725 (quoting *United States v. Loucas*, 629 F.2d 989, 991 (4th Cir.1980), *cert. denied*, 450 U.S. 1030, 101 S.Ct. 1738, 68 L.Ed.2d 224 (1981)); *see also United States v. Barbieri*, 614 F.2d 715, 717 (10th Cir. 1980); *United States v. Pomponio*, 511 F.2d 953, 956 (4th Cir.), *cert. denied*, 423 U.S. 874, 96 S.Ct. 142, 46 L.Ed.2d 105 (1975). Therefore, the conviction under Count II did not require proof of the actual commission of bribery, but only that Davis had used interstate facilities in furtherance of his illegal objective. *United States v. Peveto*, 881 F.2d 844, 855–56 (10th Cir.), *cert. denied*, 493 U.S. 943, 110 S.Ct. 348, 107 L.Ed.2d 336 (1989).[4]

The illegal objective alleged in the indictment was Davis' bribery of a Wyoming public servant, Taylor, in violation of Wyoming law. The relevant Wyoming law provides:

> (a) A person commits bribery, if:
>
> (i) He offers, confers or agrees to confer any pecuniary benefit, testimonial, privilege or personal advantage upon a public servant as consideration for the public servant's vote, exercise of discretion or other action in his official capacity....

Wyo.Stat. § 6–5–102 (1977 & Supp.1991).

■ Davis contends that the phrase "as consideration for" requires the charging party to prove that the alleged briber offered a pecuniary benefit pursuant to an *agreement* by the alleged bribee to reciprocate in some illicit manner. The Wyoming Supreme Court has not yet had an opportunity to determine whether the phrase "as consideration for" connotes the existence of an agreement between the briber and the bribee. The plain language of the statute does not necessarily require proof of a bilateral agreement and Davis does not provide any legislative history which would support his interpretation. Therefore, the Court will examine similarly worded legislation in order to determine whether the language "as consideration for" implies the existence of a bilateral agreement.

The Third Circuit interpreted two bribery statutes similar to Wyoming's in *United States v. Traitz*, 871 F.2d 368 (3rd Cir.), *cert. denied*, 493 U.S. 821, 110 S.Ct. 78, 107 L.Ed.2d 44 (1989), and held that the phrase "as consideration for" did not require proof of the existence of a bilateral agreement. In the *Traitz* case, Traitz and co-defendant Nuzzi challenged their convictions under the Travel Act on the basis that the government had not proven the existence of an agreement between the alleged briber and the alleged bribee. They had been charged with traveling from Philadelphia, Pennsylvania to Camden, New Jersey with the intent to bribe New Jersey officials, in violation of Pennsylvania and New Jersey's prohibitions on bribery. Both states' bribery statutes forbade persons from offering to confer any benefit "as consideration for" a public servant's exercise of discretion.[5] The *Traitz* court thoroughly examined the New Jersey and Pennsylvania bribery statutes and the comments to the Model Penal Code.[6] The court concluded that the

---

**4.** Likewise, as to Count I, the government was not required to prove that the completed act of bribery had occurred, but only that Davis had conspired to use interstate means in furtherance of the prohibited act of bribery.

**5.** The relevant portions of both the Pennsylvania and New Jersey statutes follow:

> A person is guilty of bribery, a felony of the third degree, if he offers, confers or agrees to confer upon another ... any pecuniary benefit *as consideration for* the decision, opinion, recommendation, vote or other exercise of discretion as a public servant, party official or voter by the recipient....
>
> 18 Pa.C.S. § 4701 (emphasis added).
>
> A person is guilty of bribery if he directly or indirectly offers, confers or agrees to confer

upon another ... any benefit *as consideration for* a decision, vote, recommendation or exercise of discretion of a public servant, party official or voter on any public issue or in any public election....

N.J.S.A. § 2C:27–2 (emphasis added).

**6.** Comment 4(c) to the Model Penal Code § 240.1 provides the following relevant insight:

> The evils of bribery are fully manifested by the actor who *believes* that he is conferring a benefit in exchange for official action, no matter how the recipient views the transaction.... It is wholly appropriate, therefore, to view the action of conferring a benefit or accepting a benefit entirely from the point of view of the actor. If he meant to confer a benefit as consideration for official action or

phrase "as consideration for" did not require the existence of an agreement, but only the briber's subjective belief that by conferring a benefit on the bribee, he would be the recipient of illicit gain. *Id.* at 386.

In *United States v. Johnson,* 621 F.2d 1073 (10th Cir.1980), this Court rejected appellant's argument for a *quid pro quo* requirement under the federal bribery statute set forth at 18 U.S.C. § 201(b)(1), stating:

> [I]t need not be shown that the public official to whom the bribe was offered was actually corrupted by the offer. It is not necessary to show that the official accepted the bribe, and the object of the bribe need not even be attainable to support a conviction for offering the bribe under § 201(b). *United States v. Jacobs,* 431 F.2d 754, 759–60 (2d Cir.1970). In fact, so long as the money is offered with corrupt intent, the official does not necessarily even need to be aware of the bribe. The statute makes *attempted* bribery a crime, and so long as a bribe is "offered or promised" with the requisite intent "to influence any official act" the crime is committed.' *Id.* at 760.

*Johnson,* 621 F.2d at 1076 (emphasis in original).

The Court concludes that the district court applied the correct legal standard. Not only does Wyoming law not require evidence of a bilateral agreement between the briber and the bribee,[7] but such evidence would not be material to a conviction for violation of the Travel Act.

#### b. *Sufficiency of the Evidence*

 The Court reviews a challenge to the sufficiency of the evidence by review-

ing the evidence in the light most favorable to the prevailing party and drawing all inferences in that party's favor. *United States v. Nall,* 949 F.2d 301, 305 (10th Cir.1991). If, in this case, there was sufficient evidence from which the jury could have found Davis guilty beyond a reasonable doubt, the denial of Davis' motion for acquittal will not be disturbed. In conducting this review, we are not permitted to weigh conflicting evidence or consider witness credibility as that duty is exclusively delegated to the jury. *Hines,* 696 F.2d at 730.

Davis challenges the sufficiency of the government's evidence with respect to both counts, alleging that the evidence before the district court proved that: (1) the committee formed to draft regulations was not formed to benefit Davis; (2) work on the Lloyd's Plan legislation did not benefit Davis; (3) Lloyd's U.S. did not need to relocate to Wyoming; (4) Taylor had no regulatory power over Davis' business and therefore could not have conferred a benefit upon Davis; and (5) Taylor never agreed to provide favors for Davis.

#### Count I

Count I charges Davis with conspiring with Taylor "and others unknown to the grand jury" to use interstate commerce to facilitate the bribery of a public official in contravention of 18 U.S.C. § 371.

 The government must prove five elements to establish a conspiracy under 18 U.S.C. § 371: (1) an agreement; (2) to break the law; (3) an overt act; (4) the purpose of which is to further the object of

---

accept a benefit for that purpose, the offense of bribery is complete.

· · · · ·

Each defendant should be judged by what he thought he was doing and what he meant to do, not by how his actions were viewed by the other party.

*Traitz,* 871 F.2d at 386 (quoting Model Penal Code § 240.1 comment 4(c) (Official Draft and Revised Comments, 1980)) (emphasis in original).

7. Davis contends that the trial court ruled on August 31, 1990 that it would require proof that

the underlying offense of bribery had been committed. However, the district court's August 31, 1990 Order points out that the issue before the court was "the requirements of pleading" and that the order was not directed to the requirements of proof. Appellant's Appendix, Vol. I, p. 19. It is clear to this Court that the district court did not impose a requirement on the government to prove the existence of a bilateral agreement between Davis and Taylor, nor could the it have imposed such a requirement as such a requirement is not supported by law.

the conspiracy; and (5) that the defendant entered the conspiracy willfully. *Nall*, 949 F.2d at 305. In *Nall*, we stated:

The nature of a conspiracy, with its attendant aspects of secrecy, often requires that elements of the crime be established by circumstantial evidence. Nevertheless, the 'evidence of conspiracy—even if circumstantial—must be such as to establish beyond reasonable doubt defendant's agreement to or participation in a plan to violate the law.'

*Id.* (citations omitted). An essential element of a conspiracy is an agreement, or a "meeting of the minds [by the co-conspirators] 'in the common design, purpose, or objects of the conspiracy.'" *Id.* (quoting *United States v. Butler*, 494 F.2d 1246, 1249 (10th Cir.1974)).

 Davis' challenges to the sufficiency of the evidence are directly relevant to whether the government succeeded in proving that Taylor, the only alleged co-conspirator, had agreed to conspire with Davis. Although Taylor was not on trial, his conduct is relevant to the existence of an agreement between alleged co-conspirators.

 The evidence is undisputed that Davis and Taylor met for the first time in April at the NAIC convention, at which time Davis expressed an interest in buying Taylor's house. A few days later Davis and Taylor spoke by telephone and reached an agreement regarding Davis' purchase of the Glenrock house. Davis agreed to purchase the home for $105,000 despite his awareness of the depressed condition of the real estate market in the geographical area at that time and of Taylor's difficulties in selling the Glenrock house. The government does not allege that, in the course of these limited conversations, the parties formally agreed to exchange favor for favor. Rather, the government attempted to prove that the parties had arrived at a tacit agreement as evidenced by

Taylor's conduct subsequent to Davis' purchase of the Glenrock house.

Our review of the record reveals only three bases on which the government attempted to create an inference that Taylor had entered into a conspiratorial agreement with Davis: (1) Taylor provided input into the composition of the committee formed to draft regulations implementing the Wyoming Risk Retention Act of 1987; (2) Taylor "intimidated" Kelly Davis with respect to the drafting of "Lloyd's Plan" legislation in Wyoming; and (3) Taylor did nothing "during the same time" Davis' business was being blacklisted in several other states. Brief for Appellee at 36.[8]

As to the first basis on which the government relies, it is noteworthy that the initial idea for the committee to draft regulations implementing the Wyoming Risk Retention Act of 1987 came, not from Taylor, but from Kelly Davis, the Deputy Insurance Commissioner. Kelly Davis approached Taylor for his input regarding membership of the committee to which Taylor replied, "Call Bob Davis." Aplt.App. at 571. The government contends that, because this directive led to a committee apparently weighted in favor of Davis, the jury could infer that Davis was illegally benefitting from Taylor's exercise of discretion.

Apart from directing Kelly Davis to Bob Davis, however, there appears to be no evidence that Taylor attempted to influence the composition of the committee. In fact Kelly Davis testified that he, not Taylor, decided the composition of the committee and issued the invitations to individuals selected. Aplt.App. at 566. Although the government places great emphasis on the fact that several individuals involved with Bob Davis were on the committee, Kelly Davis testified that he knew of only three individuals who were involved in the management of RPGs in the State of Wyoming and had tried to get all three on the

---

**8.** In support of the conspiracy charge, the government also relied on the evidence that U.S. Fiduciary Company was formed as a Wyoming corporation on May 5, 1987, after which notices were filed with the Wyoming Insurance Department on behalf of nine RPGs organized to purchase surplus lines insurance from Lloyd's U.S.

in Wyoming. Although these facts are relevant to Davis' intent, they do not implicate Taylor. While the RPGs were formed at the invitation of the Wyoming Department of Insurance, the evidence is uncontroverted that the invitation had been extended prior to the purchase of the house. Aplt.App. at 1067.

committee. However, only two of the individuals were available, one of whom was Mr. DePaemelaere. Aplt.App. at 619. In light of these apparently uncontroverted facts, the evidence of Taylor's directive to Kelly Davis loses significance.

The second basis on which the government tried to create an inference that Taylor had conspired with Davis is Taylor's alleged intimidation of Kelly Davis in connection with the drafting of "Lloyd's plan" legislation. Kelly Davis had been given the responsibility of preparing proposed legislation implementing the Wyoming Risk Retention Act, which legislation Taylor would sponsor during the 1988 legislative session. Kelly Davis testified that Bob Davis contacted him about preparing a draft of the "Lloyd's Plan" legislation. Davis had his lawyers draw up a proposal which was then submitted to Kelly Davis for review. Kelly Davis testified in response to a question as to whether he felt intimidated *by Bob Davis:*

> I was receiving pressure from the insurance commissioner to get it done. He wanted to sponsor a bill.... I wasn't intimidated by Mr. Davis. I was intimidated perhaps by the insurance commissioner saying, 'Get it done.'

Aplt.App. at 629. While Bob Davis had his attorneys working on proposed legislation, the Legislative Service Office (LSO) was also working on potential legislation regarding RPGs. Kelly Davis testified that Taylor wanted "one of those bills", Aplt. App. at 630, and that when [Kelly Davis] "brought [the LSO legislation] to Taylor's attention ... [Taylor] indicated that I no longer needed to work on the Lloyd's legislation submitted by Mr. Davis." Aplt.App. at 655.

Kelly Davis' testimony, when taken in context, does not support the government's characterization that Kelly Davis was being intimidated by Taylor because the proposed "Lloyd's plan" legislation had been prepared by Bob Davis' attorneys. Brief for Appellee at 36. Although it appears

that Taylor was anxious to have some kind of RPG legislation to sponsor during the upcoming legislative session, there is no evidence that Taylor exercised any influence in Davis' behalf. Therefore, Kelly Davis' indication that he felt intimidated by Taylor is insufficient evidence of a conspiratorial agreement between Davis and Taylor.

The remaining basis for the government's allegation of conspiracy is that Taylor failed to take regulatory action adverse to Lloyd's U.S. "during the same time when the Defendant's business was being blacklisted in several other states." Brief for Appellee at 36. The record is clear that the states which blacklisted Lloyd's U.S. did so from August to September of 1986— eight or nine months before Lloyd's U.S. even attempted to conduct business in the state of Wyoming. The record is devoid of evidence that the blacklisting continued among any other states. Difficulties which Lloyd's U.S. experienced over a six week period some months prior to initiating efforts to conduct business in Wyoming do not provide a basis for the jury to infer that Taylor had agreed to stay his hand when, in fact, blacklisting by other states had not continued.

Finally, it appears that the government neglected to provide sufficient evidence that Taylor had agreed to the alleged conspiracy because the government did not consider such evidence a necessary element of its case. In its brief, the government boldly states that " 'consideration' in the form of a specific, agreed upon *quid pro quo* is not an essential element of the Government's proof with respect to either the conspiracy or the Travel Act counts in the indictment." [9] Brief for Appellee at 38.

The district court also seems to have been confused regarding the need for the government to provide evidence of an agreement. At the close of the government's case and in response to Davis' motion for acquittal on both counts, the district court stated that "the mere fact that

---

9. The government goes on to state that, nevertheless, it has provided evidence of consideration referring to the representations we addressed above. That evidence, however, is insufficient to support a charge of conspiracy.

Taylor wasn't called on to do anything doesn't mean that he wouldn't have." Aplt.App. at 242. The court concluded it would be appropriate to allow the jury to "infer" that Taylor would have used his influence in Davis' behalf if such a request had been made. *Id.*

The Court, after a careful and thorough review of the record, concludes that the evidence before the jury was insufficient to support a verdict of guilty on the conspiracy count (Count I). While the evidence may have been sufficient to prove Davis' intent to bribe Taylor, the government did not prove beyond a reasonable doubt that there was a meeting of the minds between Davis and Taylor, the only other alleged co-conspirator. We reverse Davis' conviction on Count I.

*Count II*

■ A conviction under the Travel Act must be supported by proof that: (1) the appellant used interstate means (2) with the intent to "promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity" (3) followed by performance or an attempt to perform the proscribed activities. *United States v. Peveto*, 881 F.2d 844, 860 (10th Cir.), *cert. denied*, 493 U.S. 943, 110 S.Ct. 348, 107 L.Ed.2d 336 (1989).

Davis challenges the sufficiency of the evidence supporting the conspiracy conviction for the same reasons he challenges his conviction under Count I.

■ The first, second, fourth, and fifth alleged insufficiencies [10] incorrectly assume that evidence of an agreement is an essential element of the Wyoming law against bribery and thus a necessary element of a Travel Act violation. *See* discussion *supra* at 809–11. The remaining alleged insufficiency [11] likewise does not defeat Davis' conviction under Count II. The government was not required to prove that

Lloyd's U.S. needed to relocate to Wyoming, only that Davis attempted to bribe a Wyoming public servant in hopes of obtaining a reciprocal benefit—apparently in this case a more favorable regulatory climate.

■ The Court has reviewed the evidence produced by the government at trial and concludes that the evidence was more than sufficient to establish a violation of the Travel Act. Evidence submitted to the court reflects that Davis hoped he could obtain some regulatory advantage in Wyoming by purchasing the Glenrock house, Aplt.App. at 867, and that he was not adverse to spending as much as $40,000 in pursuit of this illegal objective, Aplt.App. at 769. Davis used interstate means to purchase the Glenrock house in a manner designed to conceal his ownership interest. He thereafter sought to do business in Wyoming and attempted to influence Wyoming legislation.

2. Evidentiary objections

■ Davis charges that the trial court committed reversible error by improperly admitting evidence which was prejudicial to defendant, extraneous to the issues before the court, and violative of Rules 403 and 404(b) of the Federal Rules of Evidence. We review the admission of such evidence under the abuse of discretion standard. *United States v. Record*, 873 F.2d 1363, 1373 (10th Cir.1989).

Davis challenges the government's introduction of evidence relevant to the alleged instability of Lloyd's U.S. including (1) evidence that Lloyd's U.S. had been blacklisted by five states in 1986; (2) alleged discrepancies in Lloyd's U.S.'s financial statements for 1985 through 1988; (3) an unfavorable June 1986 Texas audit report on Lloyd's U.S.; (4) evidence that Lloyd's had been placed in receivership by the Texas Department of Insurance in May 1990; and (5) a 1990 certificate of ineligibility issued

---

**10.** Davis' first, second, fourth, and fifth alleged insufficiencies are: (1) the committee formed to draft regulations was not formed to benefit Davis; (2) work on the Lloyd's Plan legislation did not benefit Davis; (4) Taylor had no regulatory power over Davis' business and therefore

could not have conferred a benefit upon Davis; and (5) Taylor never agreed to provide favors for Davis.

**11.** The third alleged insufficiency is that Lloyd's U.S. did not need to relocate to Wyoming.

against Lloyd's U.S. by the Wyoming Department of Insurance. Davis also challenges the introduction of evidence that Taylor had been the subject of a criminal investigation which ultimately resulted in Taylor pleading guilty in exchange for the government dropping several charges including charges that he had conspired with and accepted a bribe from Davis. Aplt. App. at 1047.

Davis contends that the evidence of the instability of Lloyd's U.S. was inadmissible under Fed.R.Evid. 404(b) which restricts admission of evidence offered to prove character.[12] The challenged evidence, however, was not offered to prove Davis' character, and thus is not within the ambit of Fed.R.Evid. 404(b). Therefore, admission of such evidence only constitutes grounds for reversal if it was irrelevant (Fed. R.Evid. 402) or unfairly prejudicial (Fed. R.Evid. 403).

■ Evidence of instability of Davis' company was relevant to establishing whether Davis had a motive to bribe Taylor due to the struggle he was having gaining acceptance of his company in other states. The jury also may have viewed the alleged financial struggles as giving Davis reason to resort to bribery in order to obtain a favorable business climate.

■ Davis argues that the evidence that Lloyd's had been placed in receivership and that the Wyoming Department of Insurance had issued a certificate of ineligibility to Lloyd's was not relevant because both events postdate the inception of the alleged bribe. The government counters that such evidence is relevant to whether Davis may have continued to seek a position of influence over Taylor during the alleged ongoing conspiracy. The Court agrees with the government that such evidence may be relevant to Davis' state of mind and the carrying on of the alleged conspiracy. Because the evidence challenged is relevant, it is admissible unless it is unfairly prejudicial. We conclude on the record that it was not.

■ Finally, Davis contends that the court committed reversible error when it allowed the government to elicit testimony from Taylor, the government's own witness, concerning a plea bargain in which charges of bribery and conspiracy with Davis had been dropped. The extent of his testimony concerning those charges was as follows: "One of those charges was based on, in this particular case, bribery and conspiracy, I believe, with Mr. Davis." Aplt. App. at 1047. Although the government did propound to the jury that Taylor had conspired with Davis in accepting a bribe, there appears to have been no other reference to the specific charges of bribery and conspiracy with Davis.[13]

■ Evidence of a co-conspirator's guilty plea is admissible for the limited purpose of assisting the jury in assessing the credibility of a witness. *United States v. Davis*, 766 F.2d 1452 (10th Cir.), *cert. denied*, 474 U.S. 908, 106 S.Ct. 239, 88 L.Ed.2d 240 (1985). However, such evidence is not admissible as substantive evi-

---

**12.** Rule 404(b) of the Federal Rules of Evidence provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Fed.R.Evid. 404(b).

**13.** The government, in its opening argument, alleged that Taylor had conspired with Davis:

The evidence in this case, ladies and gentlemen, will show that Gordon W. Taylor, Junior was the Wyoming insurance commissioner for the State of Wyoming, a very responsible position, a position of trust.... Unfortunately, Mr. Taylor abused that trust and accepted bribes from several insurance officials, among them, Mr. Davis, and that's what the evidence in this case will show.

The evidence will also show, and Mr. Taylor will tell you, that he has already pled guilty to a charge of bribery by another person not related directly to Mr. Davis....

Aplt.App. at 185–186. Notably the government made no reference to the charges that were brought against Taylor and then dropped. However, such a statement would not be grounds for reversal in light of cautionary instructions given to the jury. They were instructed that the opening statement was not be considered as evidence. Aplt.App. at 266 and 1082.

dence of the defendant's guilt. *United States v. Baez*, 703 F.2d 453, 455 (10th Cir.1983). To avoid such a result, we have cautioned that the trial court should instruct the jury that the evidence of a witness' guilty plea is received for the very limited purpose of determining witness credibility and is not to be considered as implying the guilt of the defendant. *Davis*, 766 F.2d at 1456.

The court below gave the following limiting instruction to the jury at the conclusion of Taylor's testimony:

> Ladies and gentlemen of the jury, you have just heard that the witness, Gordon W. Taylor, was a defendant in a criminal case before this Court and that Mr. Taylor has entered a plea of guilty to a crime. This evidence of Mr. Taylor's, the plea of guilty, was admitted for a very limited purpose.
>
> Specifically, the evidence was admitted so that you may assess the credibility of Mr. Taylor as a witness as part of your duty in assessing the credibility of each and every witness that will appear in this case. Under no circumstances should the evidence of Mr. Taylor's guilty plea be used by you as any evidence of the guilt of the defendant, Mr. Robert E. Davis.

Aplt.App. at 1082. While this instruction properly informed the jury as to the weight to be accorded Taylor's guilty plea, the instruction did not inform the jury what weight should be accorded Taylor's testimony that the government had charged Taylor with conspiring with Davis and bribery. The jury, while understanding that Taylor's plea of guilty to accepting a bribe from Thigpen was not to be considered as evidence of Davis' guilt, could still have concluded that the evidence that Taylor had been charged with conspiring with Davis was relevant to Davis' guilt.

Davis, however, raised no objection to the cautionary instruction. Therefore this Court can only reverse the district court if the failure to give a more specific cautionary instruction "was so egregious as to undermine the fundamental fairness of the trial and contribute to a miscarriage of justice." *Davis*, 766 F.2d at 1457.

We do not consider the introduction of the charges against Taylor to have resulted in a miscarriage of justice. There appears to be only the single passing reference to the charges and Taylor clearly indicated that those charges had been dropped by the government, thereby allowing the jury to infer that the charges may have been without merit. Moreover, Taylor denied having conspired with Davis. Under those circumstances, we cannot conclude that the failure of the cautionary instruction to refer to the dismissed charges constituted plain error. Therefore, we conclude that the introduction of the evidence that Taylor had been charged with bribery and conspiring with Davis was not unduly prejudicial. In any event, we have reversed the conviction on the conspiracy count, the only count on which Davis might have been prejudiced by Taylor's challenged testimony.

### 3. Alleged Variance Between Evidence and Indictment

Davis contends that he did not receive a fair trial because the evidence at trial varied from the allegations set forth in Count I of the indictment. Count I, which charged Davis with conspiracy, included allegations that Taylor had committed specific overt acts in furtherance of the alleged conspiracy. According to Davis, the district court allowed the government to proceed at trial under a new theory alleging a conflict of interest which caused Taylor to *refrain* from acting. Our reversal of Davis' conviction under Count I of the indictment renders this issue moot.

### 4. Challenges to Jury Instructions

Davis raises several challenges to jury instructions given by the district court on both Counts I and II. Because Count I has been reversed, we will only address the allegations of error pertaining to Count II.

In reviewing challenges to the jury instructions given by the district court, we do not review each instruction in isolation, but review the record as a whole to determine whether the jury was provid-

ed with an accurate statement of the applicable law. *Big Horn Coal Co. v. Commonwealth Edison Co.*, 852 F.2d 1259, 1271 (10th Cir.1988). The failure to instruct the jury as to a required element of the offense charged would mandate reversal. *United States v. O'Dell*, 462 F.2d 224, 232 (6th Cir.1972); *United States v. Baltrunas*, 416 F.2d 401, 402 (10th Cir.1969); *Findley v. United States*, 362 F.2d 921, 922 (10th Cir.1966).

Davis first contends that the district court committed reversible error by not instructing the jury to find evidence of an agreement supporting the underlying bribery charge before they could find a violation of the Travel Act. The Court has thoroughly addressed that issue above and concluded: (1) that violation of state law is not an element of a Travel Act violation, but is referenced by the act for definitional purposes, *supra* at 809; and (2) that evidence of a bilateral agreement is not an element of Wyoming's law against bribery. *Supra* at 811.

Davis contends that under *United States v. Dansker*, 537 F.2d 40 (3rd Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977), the government may not obtain a conviction for violation of the Travel Act when the underlying offense is bribery unless the government is able to prove the existence of an agreement. In *Dansker,* co-defendant Serota appealed his conviction under the Travel Act for *accepting* a bribe in violation of New Jersey state law. The relevant statute proscribed persons from receiving money "to obtain ... approval or disapproval ... connected with or appertaining to any office or department of the government...." *Id.* at 48 (quoting N.J.S.A. 2A:93–6). Serota had accepted a significant amount of money from individuals interested in obtaining a hotly contested zoning variance. In exchange, Serota

agreed to cease his active opposition to their application for a zoning variance. The court of appeals concluded that there was no evidence that Serota agreed to corruptly influence the Board of Adjustment. *Id.* at 50.

Davis' reliance on *Dansker* is misplaced. Davis was convicted for violating the Travel Act through commission of bribery in violation of Wyoming law. Unlike Serota, Davis was the briber—not the bribee. Even New Jersey law does not require evidence of an agreement when the charged party is the briber. *Traitz*, 871 F.2d at 385–86.

■ Davis challenges Instruction 25, which tracked the language of the Travel Act and allowed the jury to find satisfaction of the third element if it concluded:

> that the defendant following such travel in interstate commerce or use of interstate facilities performed or *attempted* to perform acts of bribery by conferring a pecuniary benefit upon Gordon W. Taylor, Junior, insurance commissioner of the State of Wyoming in order to introduce (sic) Gordon W. Taylor, Junior, in a manner favorable to the defendant's insurance company, and that the defendant thereafter performed or *attempted* to perform the unlawful activities of bribery as alleged in the indictment.

Aplt.App. at 295 (emphasis added). Davis claims the district court's instruction to the jury that they could convict Davis for an "attempt" to violate the Travel Act constitutes a *de facto* amendment of the indictment.[14]

This contention is unavailing for two reasons. First, Davis submitted a proposed instruction to the district court which included the same contested language. Aplt.

---

**14.** The indictment charges that Davis violated the Travel Act when he used interstate facilities: with intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, said unlawful activity being bribery in violation of the laws of the State of Wyoming proscribing bribery of a public serv-

ant; to wit: § 6–5–102 Wyoming Statutes 1977 and thereafter did otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of an unlawful activity, that is the bribery of Gordon W. Taylor, Jr., in violation of the aforesaid Wyoming statute. Aplt.App. at 35–36.

App. at 124.[15] The language of the indictment includes the charge that Davis "facilitate[d] the promotion, management, establishment, or carrying on, of ... the bribery of Gordon W. Taylor, Jr." This language is broad enough to permit conviction for less than the completed act of bribery so long as there is evidence that Davis facilitated the carrying on of an unlawful activity. Such terminology encompasses the concept of attempt to commit a crime. Second, while the instructions to the jury indicated that the jury could convict on the basis of an attempt to violate the underlying state law, it also permitted the jury to convict based on an actual violation of the underlying state law. The evidence before the jury was sufficient to prove that Davis did, in fact, bribe Taylor in violation of Wyoming law. *See* discussion *supra* at 814. Accordingly, the Court finds no error in the district court's instructions to the jury.

## 5. Sentencing on Count I

Davis' final argument challenges the appropriateness of the district court's reliance on the federal sentencing guidelines in imposing a sentence for conviction under Count I. This issue is moot in light of the Court's reversal of Davis' conviction under Count I.

## IV. CONCLUSION

Having examined all of Davis' arguments and having reviewed all the relevant evidence, we REVERSE Davis' conviction on Count I and AFFIRM Davis' conviction on Count II. We REMAND to the United States District Court for the District of Wyoming for further proceedings consistent with this opinion.

---

**15.** The government contends that we should review Davis' objections to the instructions under a stricter standard because Davis did not object to specific instructions at trial. However, Davis objected generally to the government's instructions. Aplt.App. at 253, which objection was renewed after the district court instructed the jury. *Id.* at 306.