65 F.3d 178
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 UNITED STATES of America, Plaintiff-Appellant, Cross-Appellee,
v.
Chris HAGER, Defendant--Appellee, Cross-Appellant,
and
Michael Allen Hall, Peter Myer Hubble, Wentworth Matthew
Houghton, and John Lampkins, Defendants.
 Nos. 93-4237, 94-4021.
 United States Court of Appeals, Tenth Circuit.
 Sept. 8, 1995.
 
 Before ANDERSON, McKAY and BRORBY, Circuit Judges.
 
 ORDER AND JUDGMENT[1]
 
 1
 After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. See Fed. R.App. P. 34(f); 10th Cir. R. 34.1.9. This cause is therefore ordered submitted without oral argument.
 
 
 2
 Following a jury trial, Chris Hager was convicted of conspiracy, 18 U.S.C. 371 (Count 1); wire fraud, 18 U.S.C. 1343 (Counts 3, 6, 10, 13, 14, 16, 19); mail fraud, 18 U.S.C. 1341 (Counts 20-22); bank fraud, 18 U.S.C. 1344 (Counts 26-31); and money laundering, 18 U.S.C.1956(a)(1)(A)(i) (Counts 32-62). On appeal, Mr. Hager asserts (1) that the evidence was insufficient to support his conviction for money laundering, and (2) that the trial court erred in denying his motions for a mistrial because of improper comments at trial.
 
 
 3
 The government cross appeals the sentence imposed, contending that the district court erroneously failed to apply the offense level mandated by the sentencing guideline. We affirm Mr. Hager's conviction but vacate the sentence and remand for resentencing.
 
 BACKGROUND
 
 4
 In 1991 Chris Hager opened Timberline Distributors, Inc. ("Timberline"), a telemarketing business in Murray, Utah. Timberline operated by inducing customers to purchase its products through various misrepresentations.
 
 
 5
 Timberline obtained the names, addresses, and phone numbers of its prospective customers through "lead" lists purchased from brokers. The Timberline salespersons who initially contacted these prospective customers generally followed the format set out in a "pitch sheet" drafted by Mr. Hager. The sales pitch was designed to convince prospective customers that they had been specially selected to receive one of five valuable bonuses, and that all they had to do was purchase from Timberline a one-year supply of vitamins for $598 or a water filter for $495-$545. Timberline's cost for these items was approximately $33 for the vitamins and $42-$54 for the water purifier.
 
 
 6
 Timberline salespersons told customers that upon purchase they would be guaranteed one of the following: (1) a 1991 Mercury Sable LS; (2) an Alaskan cruise for two; (3) a six-carat blue topaz and diamond pendant; (4) a 46" wide screen color TV; or (5) $2,500 in cash. The items were always listed in what appeared to be an order of descending value, giving customers the impression that $2,500 cash was the least valuable award. In fact, some customers were actually told that the least valuable bonus that would be awarded was $2,500. Contrary to these representations, however, every customer received the third item, a cheap pendant--known at Timberline as the "gimme gift." The pendant cost Mr. Hager approximately $30 and was valued at approximately $40.
 
 
 7
 At trial, the government proved Timberland's sales methods through various seized documents, the testimony of defrauded customers and FBI agents, and several taped conversations which the FBI made during the course of an undercover operation.
 
 DISCUSSION
 
 8
 A. Money Laundering/Sufficiency of the Evidence
 
 
 9
 The jury convicted Mr. Hager of thirty-two counts of money laundering which were based upon Timberline's use of fraudulently-generated receipts to pay Timberline's rent, employee salaries, telephone bills, inventory expenses, and other costs necessary to continue the fraudulent business. See 18 U.S.C.1956(a)(1)(A)(i). Mr. Hager argues that the evidence at trial was insufficient to support his money laundering conviction.
 
 
 10
 In reviewing a challenge to the sufficiency of the evidence, we review the record de novo, see United States v. Pike, 36 F.3d 1011, 1012 (10th Cir.1994), cert. denied, 115 S.Ct. 1170 (1995); United States v. Coleman, 9 F.3d 1480, 1482 (10th Cir.1993), cert. denied, 114 S.Ct. 1234 (1994), "and ask only whether, taking the evidence--"both direct and circumstantial, together with the reasonable inferences to be drawn therefrom"--in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt.' " United States v. Williamson, 53 F.3d 1500, 1514 (10th Cir.1995), (quoting United States v. Urena, 27 F.3d 1487, 1489 (10th Cir.), cert. denied, 115 S.Ct. 455 (1994)), petition for cert. filed, --- U.S.L.W. ---- (U.S. July 12, 1995) (No. 95-5197). To overturn a conviction, "we must find that no reasonable juror could have reached the disputed verdict." United States v. Hoenscheidt, 7 F.3d 1528, 1530 (10th Cir.1993).
 
 
 11
 To support a money laundering conviction under 18 U.S.C.1956(a)(1)(A)(i), the government must prove the defendant (1) knew that he was using the proceeds of unlawful activity; (2) conducted or attempted to conduct a financial transaction using those proceeds; and (3) did so with the intent to promote unlawful activity. Id.; see United States v. Torres, 53 F.3d 1129, 1136 (10th Cir.), cert. denied, 115 S.Ct. 2599 (1995). Mr. Hager asserts that the evidence is insufficient to show he was involved in "conducting" the financial transactions at issue. As support, Mr. Hager relies on the fact that all of the checks in question were signed by his father-in-law, Vern Clapp, and argues there was no proof that he instructed or requested that Mr. Clapp sign the checks to pay Timberline's employee expenses or operating costs. See Appellant's Br. at 19.
 
 
 12
 Mr. Hager is not shielded from legal responsibility for money laundering simply because his father-in-law signed Timberline's checks. Rather, Mr. Hager is legally responsible as long as he conducted or attempted to conduct a financial transaction. 18 U.S.C.1956(a)(1)(A)(i). For purposes of the money laundering statute, the term "conducts" has been defined to include "initiating, concluding, or participating in initiating, or concluding a transaction." Id. 1956(c)(2).
 
 
 13
 The evidence at trial revealed that the creation of Timberline was Mr. Hager's idea. Lacking capital to start the new business, he approached his father-in-law, Vern Clapp, to inquire whether he would be interested in getting involved. R. Vol. XI at 132. Mr. Clapp refinanced his home to provide the funds necessary to open Timberline and thereafter Mr. Clapp apparently did Timberline's bookkeeping and had sole authority to issue checks on Timberline's bank account. Id. at 133-34. The record is clear that Mr. Clapp, a bus driver, had never been involved in any kind of phone sales or any business relating to phone sales. Id. at 132.
 
 
 14
 On the other hand, Mr. Hager acknowledges that he had "considerable experience in the telemarketing business." Appellant's Br. at 4; R. Vol. XI at 121-25. At trial he repeatedly indicated that he started Timberline, set the budget, and actively ran and supervised all aspects of the business. See, e.g., id. at 129-36; 180, 184-89. Additionally, the record shows that Hager incurred the significant financial obligations on behalf of Timberline. For example, he purchased the premium pendant, purchased the sale products, set prices, made arrangements for processing credit card charges, wrote business contracts, determined refunds, set up phone service, hired all employees, and instructed his wife regarding payroll. See R. Supp. Vol. II, Trans. 1e at 51, 57, 84-85; Trans. 3e at 58, 62-65, 67; Trans. 10e at 13, Trans. 11e at 5-6; 9; R. Supp. Vol. I, Pl's Ex. Timb. 28, 31, 35a. Such evidence reasonably supports the conclusion that, although Clapp signed the checks, it was Hager who conducted Timberline's business and finances.
 
 
 15
 Taking this evidence in its totality and in a light most favorable to the government, we conclude that the jury could reasonably have concluded that Mr. Hager directed or at least participated in the writing of checks to cover Timberline's operating expenses and therefore that Mr. Hager "conducted a financial transaction" within the meaning of 18 U.S.C.1956.
 
 
 16
 B. Motions for Mistrial Based on Improper Remarks
 
 
 17
 Hager complains that the district court erred in denying his motion(s) for a mistrial based on allegedly improper remarks by the trial judge, a witness, and the prosecutor. The decision to deny a motion for a mistrial is within the discretion of the trial judge. United States v. Massey, 48 F.3d 1560, 1569 (10th Cir.1995). We will reverse the district court only if we find there was a clear error of judgment or if the court exceeded the range of permissible choices. United States v. Novak, 918 F.2d 107, 108-09 (10th Cir.1990). We address each of Mr. Hager's allegations in turn.
 
 
 18
 First, Mr. Hager claims that the district court abused its discretion by not declaring a mistrial after the judge mentioned that John Lampkins, an employee heard on some of the tapes at trial, had pleaded guilty. Our review of the record reveals that during opening argument, counsel for a codefendant stated: "[T]hese are just a few of the [Timberline] salesmen, but these are the only ones that are charged. The Government wants to bring it against just this group for whatever reason." R. Vol. VII at 37. The prosecution objected stating: "The presence or absence of anybody else is not an appropriate matter for comment during argument or any other time during trial." Id. Later that day, when the prosecution was preparing to play a taped conversation involving Mr. Hager, his wife, and John Lampkins, the prosecutor again requested that the court provide an instruction "regarding the presence or absence of other individuals that are being mentioned." Id. at 65-66. The court expressed some confusion about this request and ultimately informed the jury that although Lampkins had been named a party in the indictment, he had pleaded guilty. Id.
 
 
 19
 Mr. Hager moved for a mistrial. The district court denied the motion, but proceeded to thoroughly instruct the jury concerning the presumption of innocence and the fact that each defendant was to be judged separately. R. Vol. VIII at 22-24. The court stated:
 
 
 20
 [I]t's particularly important that you follow this instruction. Do not consider my statement about Mr. Lampkins having pleaded guilty in this case as any evidence touching or bearing upon the guilt or innocence of any of these seven defendants. Their case must be based upon what comes out in this courtroom relative to them and not on any other consideration. You must not consider the statements concerning Mr. Lampkins in connection with the guilt or innocence of these defendants. I wanted to make that very plain to you.
 
 
 21
 Id. at 22-23. The court continued, emphasizing the government's burden of proving each defendant's guilt beyond a reasonable doubt, and asked whether any juror had any hesitation in following the court's instruction. No juror indicated any such hesitation. Id. at 23-24. Furthermore, the trial court again instructed the jury at the end of trial that it "may not consider anything about the guilt or innocence of Mr. Lampkins as any evidence touching or bearing upon the guilt or innocence of any one of the defendants who stand trial here." R. Vol. XIII at 251.
 
 
 22
 It is fundamental that a codefendant's or coconspirator's guilty plea may not be used as substantive evidence of a defendant's guilt. See United States v. Davis, 965 F.2d 804, 815-16 (10th Cir.1992), cert. denied, 113 S.Ct. 1255 (1993); see also United States v. Pedraza, 27 F.3d 1515, 1525 (10th Cir.), cert. denied, 115 S.Ct. 347 (1994). Nevertheless, "[i]t has long been the law in this circuit and in other circuits that the trial court may inform the jury that a codefendant has entered a plea of guilty, provided the jury is clearly instructed that such a plea cannot be considered as evidence of the guilt of the remaining defendant or defendants." United States v. Earley, 482 F.2d 53, 58 (10th Cir.1973), cert. denied, 414 U.S. 1111 (1973) (where codefendant pled guilty during course of trial).
 
 
 23
 Although in Earley the trial court was informing the jury regarding a codefendant who pled guilty mid-trial, we agree with the district court that there is nothing in the record that would support a material distinction between the circumstances in this case, where Lampkins' guilty plea was entered the day before trial, and the general rule stated in Earley. As the district court noted, the indictment clearly names Mr. Lampkins as a codefendant. R. Vol. I, Doc. 1. Given that there is nothing to indicate that the jury was unaware of this charge, the jury might reasonably have wondered why Mr. Lampkins was named in the indictment but was not a party at the trial, just as they would question the sudden absence of a codefendant during trial.
 
 
 24
 Furthermore, as we have previously stated, a trial court's curative instructions may cure any prejudice where a jury learns of a codefendant's guilty plea. Massey, 48 F.3d at 1569 (citing United States v. Sanders, 929 F.2d 1466, 1470 (10th Cir.), cert. denied, 502 U.S. 846 (1991)); United States v. Martinez-Nava, 838 F.2d 411, 416 (10th Cir.1988) (analyzing problem in context of prosecutorial misconduct); see also United States v. Leach, 918 F.2d 464, 468 (5th Cir.1990) (stating that where coconspirator did not testify at trial but his guilty plea was presented to the jury, an appropriate cautionary admonition to the jury "might have salvaged the situation"), cert. denied, 501 U.S. 1207 (1991).
 
 
 25
 In this case, the court provided complete and detailed instructions both following its remark and again at the end of trial. Guided by the basic tenet of jurisprudence that "juries are presumed to follow their instructions,' " Zafiro v. United States, 113 S.Ct. 933, 939 (1993); see United States v. Coleman, 7 F.3d 1500, 1506 (10th Cir.1993), we conclude that the district court's curative instructions were sufficient to cure any possible prejudice. Accordingly, the district court did not abuse its discretion in denying Mr. Hager's motion for mistrial based upon the court's statement regarding Mr. Lampkins' plea.
 
 
 26
 Mr. Hager next claims that the trial judge should have granted a mistrial because of prejudicial remarks by Mr. Attea, a defrauded Timberline customer and prosecution witness. Mr. Attea, while exiting the courtroom after testifying, gestured toward the defense table and said, "gotcha." When defense counsel raised this issue to the court the judge stated that he had not heard or seen anything, but that he would nonetheless caution the jury. R. Vol. X at 139-40. The court proceeded to ask the jurors whether they heard any off-the-stand remarks by Mr. Attea. When some indicated that they had, the court instructed:
 
 
 27
 Let me caution you and tell you that whatever he said is absolutely not to be considered by you in connection with forming a part of the evidence here. That was off the witness stand, whatever he said. I think it had something to do with, in effect--it sounded to me like he must have been derogatory in his attitude and demeanor toward the defendants, and that is improper. It was improper. Had I realized it at the time, I would have had something to say to him about that.
 
 
 28
 Since I understand that some of you may have heard it, please disregard it. It has no part of this proceeding. It must not be used by you as any basis for a verdict, and that's the way it is. Id. at 164.
 
 
 29
 At the end of trial, in its final instructions, the court reemphasized that "[s]tatements made by any persons, inside or outside the courtroom, which are not under oath are not evidence" and that "any offhand comments that may have been made in the hall or in the courtroom while people were not on the witness stand must be disregarded." R. Vol. XIII at 244-45. The court, who was in a position to observe the jury and gauge its reactions to Mr. Attea's comment, was of the opinion that a curative instruction would solve any problem which might have been created, and we agree. Cf. Coleman, 7 F.3d at 1506. The court thoroughly instructed the jury concerning Mr. Attea's improper conduct. As we stated previously, cautionary instructions are ordinarily sufficient to cure alleged prejudice, and jurors are presumed to follow their instructions. See id. That is especially the case in situations such as this, where a witness has made an isolated, one-word remark, and the evidence against the defendant is strong. See United States v. Xavier, 2 F.3d 1281, 1285-86 (3d Cir.1993); United States v. Bello-Perez, 977 F.2d 664, 672 (1st Cir.1992); see also United States v. Arias-Villanueva, 998 F.2d 1491, 1502 (9th Cir.), cert. denied, 114 S.Ct. 573 (1993). Accordingly, the trial court did not abuse its discretion in denying Mr. Hager's motion for mistrial based on Mr. Attea's conduct.
 
 
 30
 Finally, Mr. Hager claims that a mistrial should have been granted because the prosecutor's closing argument referred to the failure of several codefendants to testify, in violation of Griffin v. California, 380 U.S. 609 (1965) (holding prosecutor's comment on defendant's failure to testify violative of self-incrimination clause of Fifth Amendment). We find this argument without merit. Mr. Hager was not prejudiced because he in fact took the stand. See United States v. Carleo, 576 F.2d 846, 850 (10th Cir.), cert. denied, 439 U.S. 850 (1978) ("The danger that a jury might infer guilt from an accused's failure to testify simply is not present when he actually does take the stand and testify."); see also Doty v. United States, 416 F.2d 887 (10th Cir.1968) (where prosecutor commented on the failure of 6 of the 8 defendants to testify, court concluded that the prosecutor's comments were improper and prejudicial as to all appellants except the 2 that testified), vacated on other grounds, 401 U.S. 1006 (1971).
 
 C. Sentencing
 
 31
 The government cross appeals the sentence imposed, contending that the district court improperly failed to apply the money laundering sentencing guideline.
 
 
 32
 The jury convicted Mr. Hager of conspiracy, wire fraud, mail fraud, bank fraud, and money laundering. In the presentence report ("PSR"), the probation officer made the following sentencing guideline calculations: Pursuant to United States Sentencing Commission, Guidelines Manual, 3D1.2(d) the conspiracy and fraud counts were grouped (Group 1), resulting in an adjusted offense level of 19. R. Vol. XVII at 13-14. A separate offense level was calculated for the money laundering counts (Group 2), see USSG 2S1.1, which resulted in an adjusted offense level of 23. Id. at 15. Under USSG 3D1.4(a), the combined adjusted offense level for the two groups resulted in 25 (calculated by adding the greater offense level of 23 to two total units. Id. at 15-16. Given Mr. Hager's criminal history category of I, the resulting guideline range was 51-71 months. USSG Ch. 5 Pt. A.
 
 
 33
 At the sentencing hearing, the district court initially appeared to accept the PSR's calculations with the exception of reducing Mr. Hager's offense level to 23 because the court regarded him as having accepted responsibility. Accordingly, Mr. Hager's guideline range would have been reduced to 46 to 57 months. Id. The district court, however, did not sentence Mr. Hager within this range. Rather, the court stated that it "consider[ed] the money laundering counts as of lesser significance in this case than the other counts, the wire fraud, the bank fraud and the fraud having to do with specific individuals." R. Vol. XVI at 35-36. Consequently, the court decided to sentence Mr. Hager as if he had been convicted only of the Group 1 offenses. Id. at 36. According to the court's new calculations for the Group 1 offenses, which reduced the aggregate loss figure two levels and granted a two level reduction for acceptance of responsibility, Mr. Hager's total offense level became 15, resulting in a guideline range of 18 to 24 months. The court then sentenced Mr. Hager to 24 months. Id. at 37.
 
 
 34
 The government contends that the district court erred in not sentencing Mr. Hager pursuant to USSG 2S1.1, the guideline provision that applies to the offense of money laundering. We review de novo a district court's legal interpretation of the United States Sentencing Guidelines. United States v. Johnson, 971 F.2d 562, 575 (10th Cir.1992).
 
 
 35
 We note at the outset that Congress requires money laundering crimes and the specified unlawful activity preceding them to be separately punished. See United States v. Edgmon, 952 F.2d 1206, 1214 (10th Cir.1991), cert. denied, 112 S.Ct. 3037 (1992). The sentencing guidelines accordingly require that a money laundering offense level be determined separately pursuant to USSG 2S1.1. Moreover, the guidelines provide an explicit procedure for determining the combined offense level when a defendant is convicted of multiple counts. See USSG 3D1.1. This procedure requires the sentencing court to "tak[e] the offense level applicable to the Group with the highest offense level" and increase that offense level in accordance with 3D1.4. See also Massey, 48 F.3d at 1568. Both the district court and this court are bound by the guidelines unless an adequate record has been made in support of a finding by the district court that a departure from the guidelines is justified. No such finding was made here. Cf. United States v. LeBlanc, 24 F.3d 340, 347 (1st Cir.), cert. denied, 115 S.Ct. 250 (1994). Accordingly, we conclude that the district court erred in not sentencing Mr. Hager pursuant to USSG 2S1.1 on the money laundering conviction.
 
 
 36
 For the above reasons we AFFIRM appellant's conviction but REMAND with directions to vacate the sentence and resentence consistent with this opinion.
 
 
 
 [1]
 This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of the court's General Order filed November 29, 1993. 151 F.R.D. 470